24 P.3d 1006 (2001)
143 Wash.2d 731
STATE of Washington, Respondent,
v.
Richard M. CLARK, Appellant.
No. 65267-8.
Supreme Court of Washington, En Banc.
Argued December 7, 1999.
Decided June 7, 2001.
*1009 Suzanne Lee Elliott, Rita Joan Griffith, Seattle, for Appellant.
*1010 Richard M. Clark, pro se.
Jim Krider, Snohomish County Prosecutor, S. Aaron Fine, Deputy, Everett, for Respondent. *1007
*1008 SANDERS, J.
Convicting Richard Mathew Clark of aggravated first degree murder, first degree kidnapping, and first degree rape, a Snohomish County jury found he did not merit leniency, and sentenced him to death. We review his sentence and underlying convictions in the Supreme Court pursuant to RCW 10.95.100 and RAP 4.2(a)(6), uphold his convictions, but reverse the death sentence, remanding for a new special sentencing proceeding.

FACTS
A. BACKGROUND
Roxanne Doll, 7, was kidnapped, raped, murdered, and dumped in a vacant Everett field at some point late in the night of March 31, 1995, or early in the morning of April 1, 1995. That morning Gail Doll-Iffrig, Roxanne's mother, discovered her daughter missing and an intensive search for Roxanne ensued. Roxanne's body was discovered one week later, on April 8, 1995, under some lawn clippings in an out-of-the-way field in Everett.
At approximately 8:30 p.m. on March 31, 1995, Gail Doll-Iffrig put Roxanne and her two siblings to bed before leaving to see a movie with a friend. At the time, Doll-Iffrig's husband and Roxanne's father, Tim Iffrig, was next door visiting the couple's neighbors, Pat Casey and Shawn Angilley. Richard Clark was also visiting at the neighbors' house. The group was drinking prodigious amounts of alcohol and using methamphetamines. Before leaving for her movie, Doll-Iffrig took her housekeys to the Casey-Angilley residence for Iffrig. Clark and Iffrig remained there until 9:30 or 9:45 p.m., at which time Clark left in his van and Iffrig returned home. Iffrig began to cook some food in the kitchen, but then passed out on the couch.
Doll-Iffrig returned home shortly after midnight to a house full of smoke. Iffrig remained passed out on the couch, and the food he put on the stove two hours earlier was burning. She woke him up, tended to the burning food, and went to check on her daughters. She quickly turned on the light in the girls' bedroom and saw what she thought were two bodies in the top bunk of the bunk bed, Roxanne and her younger sister, Kristena. However it was unclear to Doll-Iffrig, after further thought, whether she saw her two daughters or whether there were dolls in the bed.
Clark returned to the Iffrig house at about 1:00 a.m. Between about 9:30 to 9:45 p.m. and 1:00 a.m., Clark began driving around Everett with his cousin, Jimmy Miller, who had passed out from drinking in the back of his van. Clark apparently went to the Dog House Tavern in Everett, where he was seen sometime approximately during the nine o'clock hour. Next, at 10:45 p.m., he showed up at the home of Andrew and Wendy Urness, whom he asked for gas or beer money. They did not give him any, and he left after five minutes. Next Clark went to his aunt Vicki Smith's house where he arrived at about 11:00 to 11:10 p.m. There he dropped off Miller and left after about 20 minutes. Clark arrived around midnight at his aunt Carol Clark's house, where he typically resided. He was wearing a bloodstained shirt. He changed clothes and showered. He asked his aunt to wash his shirt and left around 12:45 a.m.
A witness testified to seeing Clark's van around 12:45 a.m. on April 1 at a location near where Roxanne's body was found, and testified it was unusual to see cars parked there. Another witness testified to seeing the van in that location around 1:00 a.m. but was unsure on which day.
When Clark returned to the Iffrig house at about 1:00 a.m., the two began talking about a camping trip they had planned for later that day. Shortly thereafter they returned to the Casey-Angilley house next door and partied the rest of the night using alcohol and drugs. At 6:30 a.m. on April 1, Clark and Iffrig began packing for the camping trip and subsequently left.
Approximately one hour later, on April 1, the Iffrigs' youngest child, Nicholas, woke up *1011 Doll-Iffrig to alert her that he could not find Roxanne. As the morning wore on, Doll-Iffrig searched the house, called nearby friends and relatives, and concluded that Roxanne was not at home or in the area. She hoped Roxanne went camping with her husband that morning, but learned from her sister-in-law Kim Morrell, who had seen Iffrig and Clark on their way to the campsite, that Roxanne was not with them. Doll-Iffrig called the police, reproduced missing-person fliers with Roxanne's picture, and left for the campsite to inform Iffrig. The camping party broke up. Iffrig returned with his wife, and Clark left the campsite in his van.
Later that afternoon, at about 4:30 p.m., Clark went to the Everett police station accompanied by his aunt Vicki Smith. There they met with Lieutenant Peter Hegge, to whom they showed copies of the missing-person flier they wanted to distribute. Lieutenant Hegge asked them to go to the Doll-Iffrig house and talk to police there. Clark said he would drive over, but seeing the number of police at the house, he continued on. He told Smith at the time he was driving without a license.
The next day, April 2, Detective Lloyd Herndon interviewed Clark and asked him why he had not come out to the Iffrig house the previous day. Clark responded he was low on gas and could not make it out. When asked why he did not page Detective Herndon, Clark responded he did not want to hassle with the police. Clark consented to a cursory search by Detective Herndon of his van.
Interest in the case began to shift to Clark. On April 3, the Everett police impounded Clark's van, and received a telephonic search warrant to search it and seize any trace evidence of Roxanne's kidnapping. Clark was placed on 24 hour surveillance by the Everett police and the FBI.
That same day, Clark telephoned his step-brother, Elza Clark, asking him to lie to police about bloodstains in Clark's van; Clark asked Elza to say the blood had come from a poached deer. However Elza refused to lie.
The Everett police arrested Clark on April 7 on suspicion he was involved with Roxanne's disappearance. The following day, April 8, Roxanne's body was found by two young girls near a path on an Everett hillside, lying in a hollow and covered with yard clippings. Clark was charged, by amended information, with aggravated first degree murder, kidnapping, and first degree rape.
On April 8, from jail, Clark telephoned Toni Clark, his step-mother and mother of Elza Clark. Clark renewed his request that Elza lie about deer blood in his van. Ms. Clark asked Clark during that conversation whether he kidnapped Roxanne, whether he raped her, and whether he killed her. Clark answered that he did not know, and related the amount of alcohol and drugs he had consumed that night. He told Ms. Clark not to grieve if he received the death penalty.
While in jail, Clark had conversations with Eugene Hillius, a fellow inmate. Hillius testified at trial that Clark at one point related his anger that his brother would not lie to police about the blood in the van, and at another point stated "they took my DNA [deoxyribonucleic acid] sample out of her butt." Verbatim Report of Proceedings (RP) (Apr. 4, 1997) at 4639 (trial).
B. EVIDENCE AT TRIAL
Evidence of Roxanne's autopsy was admitted at trial. The autopsy revealed bruising and tearing in her vagina, with two lacerations two and three centimeters long, respectively. The pathologist testified these injuries were caused by the insertion of something the size of an adult penis, and could have been sufficient by themselves to cause lethal exsanguination.
However, Roxanne died because of at least seven stab wounds to her neck, one of which severed her left internal jugular vein. The size and shape of the wounds were consistent with a small, single-edged blade such as a pocketknife. Roxanne's hands also displayed knife wounds, and it was unclear whether the wounds were defensive or intentionally inflicted.
Semen was recovered from Roxanne's body and through DNA testing it was *1012 matched with Clark's to the extent the chance of a random match was 1 in 5400 or 1 in 6 quadrillion depending upon the method of testing used.
The shirt Clark wore on the night of the murder was tested, despite having been laundered, for DNA. Human blood was found containing DNA consistent with Roxanne's. The chance of a random match was estimated at 1 in 1200.
A bloodstain found on the sleeping bag seized from Clark's van was also determined consistent with Roxanne's DNA. The chance of a random match was estimated at 1 in 1000, 1 in 9400, and 1 in 5 billion, depending on the testing method used.
Microscopic carpet fibers found on Roxanne's underclothes were consistent with the carpet in Clark's van. Clark's fingerprint was lifted from Roxanne's bedroom window.
Clark's primary defense was alibi. Through cross-examination of the state's witnesses, Clark sought to establish that (a) Doll-Iffrig saw Roxanne in bed after midnight on April 1, and (b) that Clark was seen at so many different locations between 9:30 p.m. on March 31 and 1:00 a.m. on April 1 that he did not have time to commit the crime. Clark's alternative theory was the evidence was insufficient to establish premeditation.
After three weeks of trial, the jury found Clark guilty of aggravated first degree murder, first degree kidnapping, and first degree rape.
C. EVIDENCE AT PENALTY PHASE
At the sentencing hearing the state introduced evidence of Clark's nine prior convictions. These included unlawful imprisonment, second degree burglary, attempting to elude a police officer, taking a motor vehicle without permission, vehicle prowling, and second degree theft. Over vigorous defense objection the state was also allowed to introduce evidence of certain facts underlying Clark's 1988 false imprisonment charge, viz., that the victim was four years old and known to Clark.
The state also introduced a victim impact statement read by Doll-Iffrig which described Roxanne's interests, hobbies, and the effect of her death on the family.
In mitigation Clark introduced evidence of his rough childhood, including harsh treatment by his step-father, Bob Smith, and the untimely death of Clark's mother when Clark was 14. Apparently Smith was not Clark's biological father but the "father figure" in the home during his younger years. Smith and Clark's biological mother, Kathleen Smith, were regular and heavy users of alcohol and marijuana. Clark was frequently subjected to abuse and neglect. Once he was forced to eat a cigar for punishment. He became an alcoholic early in his teenage years, attempted suicide three times, and dropped out of school during junior high. He was 26 when he killed Roxanne.
The jurors found the state proved beyond a reasonable doubt that there were not sufficient mitigating circumstances to merit leniency, and imposed the death penalty. Clark was sentenced to death on April 25, 1997, for the aggravated first degree murder; 68 months for the kidnapping; and 102 months for the rape. The Snohomish County Superior Court Clerk filed a notice of mandatory review of death sentence. Clark filed a notice of appeal, and the state filed a notice of cross-appeal.

ANALYSIS
A. PRETRIAL ISSUES
1. Renewed Challenge to State v. Clark, 129 Wash.2d 805, 920 P.2d 187 (1996) (Clark I)
Clark argues that, contrary to our holding in State v. Clark, 129 Wash.2d 805, 920 P.2d 187 (1996) (Clark I), the prosecution should not have been entitled to seek the death penalty due to the defective service of the state's notice of intent to seek the death penalty pursuant to RCW 10.95.040. This court rejected that argument, finding that Clark's trial counsel actually received notice of the intent to seek the death penalty within the statutory period for filing the notice. Clark I, 129 Wash.2d at 809, 920 P.2d 187. Looking to the requirements of CR 5 for instruction, we held that the statutory service under RCW 10.95.040 was timely served *1013 and filed. Clark I, 129 Wash.2d at 815-16, 920 P.2d 187. Clark invites us to revisit that holding essentially because, in his estimation, the court incorrectly applied the requirements of CR 5.
However, the law of the case doctrine prevents Clark from seeking further reconsideration of our decision. As we have recognized before:
Where there has been a determination of the applicable law in a prior appeal, the law of the case doctrine ordinarily precludes redeciding the same legal issues in a subsequent appeal.
"It is also the rule that questions determined on appeal, or which might have been determined had they been presented, will not again be considered on a subsequent appeal if there is no substantial change in the evidence at a second determination of the cause. The Supreme Court is bound by its decision on the first appeal until such time as it might be authoritatively overruled."
Folsom v. County of Spokane, 111 Wash.2d 256, 263, 759 P.2d 1196 (1988) (quoting Adamson v. Traylor, 66 Wash.2d 338, 339, 402 P.2d 499 (1965)). Subsequent appellate reconsideration of an identical legal issue will be granted only where "the holding of the prior appeal is clearly erroneous and the application of the doctrine would result in manifest injustice." Folsom, 111 Wash.2d at 264, 759 P.2d 1196 (citing Greene v. Rothschild, 68 Wash.2d 1, 10, 402 P.2d 356, 414 P.2d 1013 (1965)).
The court's unanimous ruling in Clark I is not clearly erroneous. Clark presents no new theory as to our purported error, and we cannot find one. While Clark argues that allowing the death penalty to remain intact in light of this issue is a manifest injustice, we noted in Clark I that "[i]t is not disputed the notice was received by counsel for Clark within the statutory period." Clark I, 129 Wash.2d at 809, 920 P.2d 187. Clark had both actual and timely notice of the state's intent to seek the death penalty.
2. Disclosure of Paperwork Establishing Receipt of the Notice of Intent to Seek Special Sentencing Proceeding
In a separate but related argument, Clark urges that our holding in Clark I was based on a piece of evidencethe public defender's own time-stamped copy of the death penalty notice with "an attachment affixed by the Snohomish County Public Defender's Office"the disclosure of which was improperly ordered by the trial court. Clark at no point tells us anything about the attachment affixed to the notice other than its existence.[1] Br. of Appellant at 78. Presumably the document is the standard death penalty notice onto which is affixed the public defender's time stamp.
Clark argues the ordered disclosure of this document violated the obligation of Clark's counsel under the Rules of Professional Conduct (RPC) to maintain inviolate Clark's confidences and secrets, including "information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." Washington Court Rules, RPC Terminology 34 (1999). Without the production of that document, Clark contends, the factual basis underlying our holding in Clark Ithat actual and timely notice was received-is washed away. Clark further adds that the trial court's order compelling discovery of that evidence, as it put a wedge between Clark and his attorney, deprived Clark of his Sixth Amendment right to counsel.
This sounds like another attempt to relitigate Clark I. As the law of the case doctrine states, "[Q]uestions determined on appeal, or which might have been determined had they been presented, will not again be considered on a subsequent appeal." Folsom, 111 Wash.2d at 263, 759 P.2d 1196 (emphasis added) (quoting Adamson, 66 Wash.2d at *1014 339, 402 P.2d 499). This new argument attacking the factual basis of our holding in Clark Iis barred from review according to the analysis set forth above. It would have been properly raised in the previous appeal, and does not present new evidence meriting an "`authoritative[ ] overrule[ ]'" of Clark I. Greene, 68 Wash.2d at 10, 402 P.2d 356, 414 P.2d 1013 (quoting Adamson, 66 Wash.2d at 339, 402 P.2d 499).
3. Sufficiency of Search Warrants
Clark contends the trial court erred in failing to suppress physical evidence seized from his van and residence because his van was impounded without a warrant and without probable cause and the search warrant subsequently issued was also without probable cause. Specifically, Clark argues there was no probable cause to impound his van because Detective Herndon performed a search of the van the previous day and found nothing obviously incriminatory. Therefore probable cause to search the van was lacking.
Further, Clark argues, the warrant issued subsequent to the impounding lacked probable cause in part because the affidavit supporting the warrant merely mentioned that Clark had a previous criminal history involving a similar crime, and that Clark had failed a polygraph test with respect to the Doll disappearance. Clark further claims the affidavit contained intentional or recklessly made material omissions, and was merely a boilerplate affidavit. Moreover Clark claims the warrant, once issued, was overbroad and lacked particularity with respect to evidence to be seized. Therefore, Clark contends the state and federal constitutions compel suppression of the evidence seized as fruit of these searches. Since further search warrants four in totalrelied on evidence seized from the van and had supporting affidavits indistinguishable in basic form from the first objectionable warrant, Clark argues that virtually every piece of physical evidence found in this case should be suppressed as tainted fruit of the illegal van search.
The state challenges each of these assertions with respect to the first affidavit because the validity of the subsequent affidavits, containing substantially the same evidentiary foundation, will stand or fall with the first.
As a threshold matter, "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In this regard we have noted:
The concept of probable cause requires the existence of reasonable grounds for suspicion supported by circumstances sufficiently strong to warrant a man of ordinary caution to believe the accused is guilty of the indicated crime. It is only the probability of criminal activity and not a prima facie showing of it which governs the standard of probable cause.
State v. Seagull, 95 Wash.2d 898, 906-07, 632 P.2d 44 (1981) (citations omitted). Further "[i]n determining whether probable cause exists, a magistrate is entitled to draw reasonable inferences from the facts and circumstances set forth in the affidavit," State v. Condon, 72 Wash.App. 638, 642, 865 P.2d 521 (1993) (citing State v. Helmka, 86 Wash.2d 91, 93, 542 P.2d 115 (1975)), and his determination is given great deference by a reviewing court and will not be reversed absent an abuse of discretion. Seagull, 95 Wash.2d at 907, 632 P.2d 44. The affidavit must be read in a common-sense manner and doubts should be resolved in favor of the warrant. State v. O'Connor, 39 Wash.App. 113, 123-24, 692 P.2d 208 (1984). With this in mind we turn to Clark's specific allegations.
a. Did the April 3, 1995 search warrant (and therefore the three subsequently issued warrants) lack probable cause?
i. Did the factual information set forth in the affidavit fail to establish probable cause?
The affidavit in support of the telephonic warrant issued by Judge Fisher on April 3, 1995, set forth: Roxanne Doll was reported missing by her mother, Doll-Iffrig, at about 10:00 a.m. on April 1, 1995; Doll-Iffrig last definitely saw Roxanne alive at about 8:30 p.m. the previous night upon putting *1015 Roxanne and her siblings to bed; Clark and Roxanne's father, Iffrig, were drinking at that time at the next-door neighbors' house while Doll-Iffrig left with a friend to see a movie; Doll-Iffrig returned home about midnight to find her husband passed out on a living room sofa; Doll-Iffrig thought but was not certain she saw Roxanne in bed with the latter's sister in the top bunk of their bunkbed at midnight; that Clark returned to the Iffrig house around 1:00 a.m. that morning; Clark was at the Iffrig house earlier that evening and was seen driving his van to and from the residence; Clark has a 1988 conviction for unlawful imprisonment when he restrained a four-year-old girl and sexually molested her; a polygraph test was administered on Clark by an agent of the FBI on April 2 during which Clark denied knowledge of and responsibility for Roxanne's disappearance; in the FBI agent's opinion, Clark was clearly deceptive in his denials during the polygraph examination; had the victim been removed from her house in the van she would have left trace evidence behind in the van; and that when questioned after the polygraph examination Clark stated he had not hurt Roxanne.
The trial court found that although the affiant, Detective Herndon, did not use the word "kidnap" during the telephone conversation with Judge Fisher, the latter "knew the crime with which he was dealing. The police knew that they were restricted to searching for trace evidence left behind after a kidnapping." 5 Clerk's Papers (CP) at 993.
Clark contends that his presence near the victim's house on the night she disappeared, his prior conviction, and his purported failure of a polygraph examination are insufficient bases for probable cause.
However "[p]rior convictions of a suspect are a factor which can be considered in determining whether probable cause exists." State v. Stone, 56 Wash.App. 153, 158, 782 P.2d 1093 (1989). Here Clark's prior conviction was for unlawful imprisonment of a young girl for ostensibly sexual purposes (the affidavit set forth that after binding her in his garage with a pair of socks, Clark groped this girl's vaginal area outside her clothing). This was a crime of the same general nature as that in which Detective Herndon was attempting to uncover evidence, and therefore was not only proper but helpful in establishing probable cause. Greenstreet v. County of San Bernardino, 41 F.3d 1306, 1309 (9th Cir.1994) (citing United States v. Conley, 4 F.3d 1200, 1207 (3d Cir.1993)).
Further, although polygraph results are not admissible at trial unless stringent conditions have been met, see State v. Renfro, 96 Wash.2d 902, 905-08, 639 P.2d 737 (1982), such evidence may be considered in a magistrate's probable cause determination. State v. Cherry, 61 Wash.App. 301, 305, 810 P.2d 940 (1991). Here Clark's polygraph performance was deemed "deceptive" by the administering FBI agent. Clark challenges the conclusion of the FBI agent in that his qualifications and indicia of reliability were not set forth in Detective Herndon's affidavit. However in State v. Lair, 95 Wash.2d 706, 712, 630 P.2d 427 (1981), we noted that information from a reliable informant has corroborative value even if the informant's basis of knowledge is not specified. Here the FBI agent's basis of knowledge is the administration of the polygraph and his clinical and common-sense observation of Clark's performance. Clark seems to be claiming that no foundation is laid in the supporting affidavit to support the agent's qualifications. But the agent need not submit a curriculum vitae to the affiant for his conclusions developed during the administration of the polygraph to be probative and corroborative as the magistrate makes his probable cause determination.
The state compares the affidavit in this case to that in State v. Gentry, 125 Wash.2d 570, 888 P.2d 1105 (1995), where the challenged affidavit set forth that a young girl had been sexually assaulted and murdered; that the hair of a black person was found on her shirt; that Gentry, a black man, was seen near the time of the murder within a mile of where the body was found; and that Gentry had been previously charged (in an unrelated event) with the rape of a young girl. The facts in this case are similar in that a young girl had been kidnapped; Clark had a previous conviction for the restraint of a young girl; Clark was undisputedly in and *1016 around the victim's house around the time of her suspected abduction.
While Clark may be correct that no single one of these evidentiary bases may have been enough to establish probable cause per se, there is no basis for believing that, taking this information on the whole, the issuing magistrate could form no reasonable belief that Clark was probably involved in the criminal activity under investigation.
ii. Did Detective Herndon omit facts material to the magistrate's probable cause determination?
Clark claimed under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), that Detective Herndon made two material omissions or misstatements to the issuing magistrate, viz., failing to mention that he had made a brief but inconclusive search of the van prior to applying for the search warrant and failing to mention that Doll-Iffrig told him she thought she saw Roxanne in bed with her sister when she returned at midnight of April 1, 1995. Clark contends that had these facts been included in the affidavit, no reasonable magistrate could have found probable cause to issue the search warrant.
In order to invalidate the warrant on this ground Clark must show evidence of deliberate material omission or statements made in reckless disregard of the truth. State v. Garrison, 118 Wash.2d 870, 872, 827 P.2d 1388 (1992). "`[A]llegations of negligence or innocent mistake are insufficient.'" Id. (quoting Franks, 438 U.S. at 171, 98 S.Ct. 2674). As the court noted in O'Connor, 39 Wash.App. at 117-18, 692 P.2d 208, Franks and the relevant Washington decisions do not illuminate what constitutes "reckless" disregard for the truth. However O'Connor applied the test of United States v. Davis, 617 F.2d 677, 694 (D.C.Cir.1979), where the court deemed recklessness shown where the affiant "`in fact entertained serious doubts as to the truth' of facts or statements in the affidavit." O'Connor, 39 Wash.App. at 117, 692 P.2d 208 (quoting United States v. Davis, 617 F.2d 677, 694 (D.C.Cir.1979) (quoting St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968))). Such "serious doubts" are "shown by (1) actual deliberation on the part of the affiant, or (2) the existence of obvious reasons to doubt the veracity of the informant or the accuracy of his reports." O'Connor, 39 Wash.App. at 117, 692 P.2d 208 (citing Davis, 617 F.2d at 694). "If these requirements are not met the inquiry ends." Garrison, 118 Wash.2d at 873, 827 P.2d 1388.
At Clark's Franks hearing, the trial court found the following with respect to Detective Herndon's affidavit:
[T]he omission of details regarding Ms. Doll-Iffrig's statement of her observations is not material. The statement in the affidavit that Ms. Doll-Iffrig was "unsure" of whether she saw Roxanne is truthful. This was the substance of oral statements made to Det. Herndon by Ms. Doll-Iffrig; the progression of Gail's thought processes was indicated by the fact that her second written statement is more vague than her first statement. The court finds that the failure to recite all of Ms. Doll-Iffrig's statements or comments was neither an intentional nor a reckless attempt to mislead Judge Fisher.
The omission of a statement describing Det. Herndon's cursory search of the van on April 2, 1995 was not relevant or material. The purpose of the April 3, 1995 search warrant was for trace evidence. During his initial cursory search on April 2, Det. Herndon did not see anything remarkable; this does not mean that there would not be trace evidence in the van. This was not an intentional nor a reckless misleading omission. Since there were no misleading misrepresentations or omissions contained in any of the affidavits, no portions of the affidavits will be excised.
5 CP at 995-96. The trial court found no actual deliberation or effort to omit material information by Detective Herndon, or obvious reasons to doubt his veracity in making the affidavit. A trial court's finding on whether an affiant deliberately excluded material facts is a factual determination, upheld unless clearly erroneous. State v. Cord, 103 Wash.2d 361, 367, 693 P.2d 81 (1985) (citing In re Welfare of Sego, 82 Wash.2d 736, 513 P.2d 831 (1973)).
*1017 With respect to Detective Herndon's statement that Doll-Iffrig was unsure whether Roxanne was in bed at midnight on April 1, 1995, this would seem to be an accurate summary of Doll-Iffrig's statements on the matter. Doll-Iffrig turned the light on in her daughter's room only momentarily, and was unsure whether she saw Roxanne or a large doll, which she testified her daughters often slept with.
With respect to Detective Herndon's April 2, 1995, consensual search of Clark's van, he testified he was merely looking for "something obvious that would connect with Roxanne Doll" and not for trace evidence of Doll. RP (Jan. 29, 1996) at 23 (3.6 hearing).
Herndon further testified at the Franks hearing he neither intentionally omitted information from his affidavit nor had he lied. The trial court had the latitude to believe Herndon's testimony, and nothing else in the record would support the conclusion that the trial court's findings on this issue were clearly erroneous.
Assuming the trial court clearly erred in that the failure to include information about the prior consensual search was a material omission, and that Detective Herndon materially misstated what Doll-Iffrig saw in her daughter's bed on April 1, 1995, the test is to add the omitted facts to the affidavit and subtract the misstatements. Garrison, 118 Wash.2d at 873, 827 P.2d 1388; Kinder v. Mangan, 57 Wash.App. 840, 846, 790 P.2d 652 (1990). If probable cause nevertheless exists the warrant stands.
Given the difference between the search for trace evidence contemplated by the search warrant and the cursory search Detective Herndon performed the day before, and given Doll-Iffrig's numerous statements as to her uncertainty whether she saw Roxanne in bed, we would uphold the probable cause determination even under the Garrison test.
b. Was the April 3, 1995, search warrant sufficiently particular?
Clark contends that because the April 3 search warrant merely authorized a search for trace evidence it failed to meet the constitutional requirement of particularity about the thing to be searched and the evidence to be seized. The trial court at Clark's Franks hearing rejected that contention.
Whether a warrant meets the particularity requirement of the Fourth Amendment is reviewed de novo. State v. Stenson, 132 Wash.2d 668, 691, 940 P.2d 1239 (1997), cert. denied, 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998).
In Stenson we gave the particularity requirement thorough treatment. We recalled:
To comply with the mandate of the Fourth Amendment particularity clause, a search warrant must be sufficiently definite so that the officer executing the warrant can identify the property sought with reasonable certainty. Thus, search warrants are to be tested and interpreted in a common sense, practical manner, rather than in a hypertechnical sense.
In general, the degree of specificity required varies according to the circumstances and the type of items involved. A description is valid if it is as specific as the circumstances and the nature of the activity, or crime, under investigation permits.
The fact that a warrant lists generic classifications ... does not necessarily result in an impermissibly broad warrant..... [W]here the precise identity of items sought cannot be determined when the warrant is issued, a generic or general description of items will be sufficient if probable cause is shown and a more specific description is impossible.
Stenson, 132 Wash.2d at 691-92, 940 P.2d 1239 (citations omitted).
The scope of the search warrant Detective Herndon sought was based on the following language in the affidavit:
[Y]our affiant is requesting the search warrant for Mr. Clark's van, a 1978 Dodge van, beige in color, Washington license 45297H ... registered to Mr. Richard Clark....
Mr. Clark was seen at the residence with the above listed van and left several times in this van. If Roxanne was removed from her residence by use of the van, there *1018 would be trace evidence from the victim in the van.

7 CP at 1265 (emphasis added). As a term of art, "trace evidence" means "small items of a foreign material left on another," Br. of Resp't at 31 (citing 13A Seth A. Fine & Douglas J. Ende, Washington Practice: Criminal Law § 507, at 100 (2d ed.1998)), of which there are many possible types, including "blood, hairs, fibers...." 4 Cyril H. Wecht, Forensic Sciences § 36.04(d)(1)(i), at 36-44, 36-45 (1998). Due to the inherent size and multiplicity of kinds of trace evidence, their prior identification in a warrant is impossible and thus a generic classification, under Stenson, is appropriate.
Such generic classifications are frequently upheld. See, e.g., State v. Reid, 38 Wash. App. 203, 211-12, 687 P.2d 861 (1984) (specific items plus "`any other evidence of the homicide'" (quoting language of warrant)); State v. Lingo, 32 Wash.App. 638, 640-42, 649 P.2d 130 (1982) ("`any and all evidence of assault and rape including but not limited to'" specified items (quoting language of warrant)); State v. Benner, 40 Ohio St.3d 301, 533 N.E.2d 701, 709 (1988) ("fibers and hairs and other trace evidence for comparison").
It therefore appears the April 3, 1995, search warrant was not impermissibly broad, as it limited the search to trace evidence in Clark's van of Roxanne Doll. Merely because the search for trace evidence involved the search of many items in the van for trace evidence, including parts of the walls and floors of the vehicle, does not therefore make the search a "`general, exploratory rummaging in a person's belongings'" prohibited by the Fourth Amendment. Andresen v. Maryland, 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)).
c. Was the seizure of Clark's van without warrant improper?
Clark argues that under article I, section 7, of the Washington Constitution and the Fourth Amendment to the United States Constitution the warrantless seizure of his van on April 3, 1995, was impermissible and that its illegality taints the subsequent search warrants and all evidence seized thereafter as fruit of the impounded van.
A motor vehicle may be impounded if there is probable cause to believe that it was used in the commission of a felony. State v. Simpson, 95 Wash.2d 170, 189, 622 P.2d 1199 (1980). Clark's argument that the police lacked probable cause to impound his van is based on the same argument that the magistrate lacked probable cause to issue a search warrant, viz., knowledge of Clark's previous conviction for unlawful imprisonment coupled with his failed polygraph test did not constitute probable cause in light of Detective Herndon's cursory search of the van the previous day.
However this argument must fail in light of the analysis set forth above, as there was probable cause to impound the vehicle based on this amassing of corroborative evidence that began to link Clark to the abduction under investigation. This is the same corroborative evidence which allowed the magistrate to issue a search warrant for the van hours after it was impounded.
4. Change of Venue
Clark argues that his state and federal due process rights to a fair and impartial jury trial were denied because the trial court (twice) denied his motion for a change of venue. He contends the pretrial publicity affected the jury's ability to impartially decide his case.
"`The decision to grant or deny a motion for change of venue is within the trial court's discretion and appellate courts are reluctant to disturb such a ruling absent a showing of abuse of discretion.'" State v. Rice, 120 Wash.2d 549, 556, 844 P.2d 416 (1993) (quoting State v. Hoffman, 116 Wash.2d 51, 71, 804 P.2d 577 (1991)). To demonstrate an abuse of discretion, the defendant must show "`a probability of unfairness or prejudice from pretrial publicity.'" Rice, 120 Wash.2d at 556, 844 P.2d 416 (quoting Hoffman, 116 Wash.2d at 71, 804 P.2d 577). The abuse of discretion analysis proceeds according to an application of the nine factors set forth in *1019 State v. Crudup, 11 Wash.App. 583, 524 P.2d 479 (1974) to the facts of each case:
(1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

Crudup, 11 Wash.App. at 587, 524 P.2d 479 (citing Peter G. Guthrie, Annotation, Pretrial Publicity in Criminal Case as Ground for Change of Venue, 33 A.L.R.3d 17, 33 (1970)). As "each case is factually unique, previous cases applying the factors are helpful, but are by no means dispositive of the outcome." Rice, 120 Wash.2d at 556, 844 P.2d 416.
The trial court twice considered these factors upon Clark's motion for change of venue, and twice denied the motion.
a. Inflammatory nature of the publicity
Clark strenuously urges that a large amount of inflammatory publicity, calculated to evoke strong emotional responses, saturated the community around Everett in Snohomish County. Br. of Appellant at 111, 113, 115.
The trial court found that much of the publicity around the time of the crime, and which followed some of the court proceedings, was emotional in nature, including statements from the Doll family, and requests for public assistance in locating her. However the trial court found that "[t]he media coverage itself didn't create the inflammatory publicity as much as the facts of the crime, and the coverage itself did not appear to be designed or directed to inflame.... The inflammatory nature of this case is by reason largely of the nature of the crime itself." RP (Dec. 28, 1995) at 17 (defense motion for change of venue). We echoed this reasoning in a previous death penalty case by way of dicta:
Although the publicity was widespread, it was largely factual in nature. The articles described the crime, the victims and the police investigation. The crime, rather than the publicity itself, generated public reaction.
State v. Rupe, 101 Wash.2d 664, 675, 683 P.2d 571 (1984) (Rupe I). The nature of the publicity in this case does not by itself militate for or against a change of venue in this case.
b. Degree to which publicity was circulated
Clark argues, the trial court found, and the state concedes, that the publicity in this case was largely disseminated throughout Snohomish County, a factor that militates in favor of a change of venue.
c. Length of time elapsed
Most media coverage of the case prior to the commencement of jury selection (in late February 1997) occurred around the time of the crime, April 1995. Little if any media coverage occurred in the intervening time. This factor militates against a change of venue. See Rice, 120 Wash.2d at 557, 844 P.2d 416 (22 month delay); State v. Maupin, 63 Wash.App. 887, 896, 822 P.2d 355 (1992) (two-year delay). Even Judge Thorpe, upon first entertaining the change of venue motion in December 1995, had thought the eight months elapsed since the crime had likely dislodged any impressions in the minds of prospective jurors.
d. Care exercised and difficulty of jury selection
Clark argues that 114 prospective jurors were individually questioned during voir dire and of those, 97 were aware of the pretrial publicity; 17 were not. Only nine jurors, Clark alleges, who were not excused for hardship or for their views of the death penalty, had not heard of the case. Twelve of the remaining jurorsapproximately 15 *1020 percent of the remaining panel, Clark calculates were excused for cause for having formed an opinion as to guilt based on the pretrial publicity. Clark points to Janice Preston, number 2 (RP (Mar. 3, 1997) at 52-54 (individual preliminary voir dire)), as one seated juror who stated during voir dire that she recalled the publicity and recalled that she felt at the time that Clark was guilty. However Ms. Preston also stated in voir dire that she could put aside that opinion and decide the case on the evidence. Beyond Ms. Preston, Clark further submits that only one of the seated jurors expressly disavowed prior knowledge about the crime.
The state quibbles with Clark's arithmetic, arguing that most jurors who were excused expressed a hardship or strong views about the death penalty. The state maintains that only eight prospective jurors out of the entire panel were excused for bias borne out of pretrial publicity.
Whether it was 1 seated juror, 8 prospective jurors, or 12 prospective jurors out of a panel of 114, there is nevertheless no evidence presented of such an overwhelming pretrial bias amongst the panel members that a fair and impartial jury could not be selected.
e. Effect of publicity on jurors
Of the 162 jurors filling out a juror questionnaire, 24 (or 15 percent) claimed they had not seen, read, or heard anything about the case, and 102 of the remaining 138 (or 63 percent) said they had formed no opinion about the case. Twenty-nine prospective jurors claimed they had formed an opinion, six did not respond to the question, and one marked both yes and no. Br. of Resp't at 48 nn. 20-21. Of the jurors who were seated and who deliberated, two claimed they had not seen, read, or heard anything about the case, two could not remember anything specific about what they had read or heard, seven remembered something but had not formed an opinion. Only Ms. Preston, above, had previously formed an opinion but as noted, claimed during voir dire she could set her opinion aside. Ms. Preston was not challenged for cause.
As we noted in Rice, "[t]he relevant analysis is whether the jurors had such fixed opinions that they could not act impartially." 120 Wash.2d at 558, 844 P.2d 416. Clark does not present persuasive evidence of juror partiality.
f. Challenges exercised by defendant
While eight jurors were excused for cause based on opinions formed during pretrial publicity, no other jurors were challenged on this basis. The defense used 11 of its 12 peremptory challenges. We have previously held "if a defendant does not exercise all peremptory challenges it is presumed that he or she was satisfied with the jury." Rice, 120 Wash.2d at 558-59, 844 P.2d 416. Clark claims he was not satisfied with the jury, but tactically withheld his last peremptory challenge because, as a result of the method of selection, Clark knew he would get a putatively more adverse juror if he used his last peremptory challenge (presumably on Ms. Preston).[2] Clark analyzes this factor as if he had in effect exercised all of his peremptory challenges. Clark's argument in this regard goes to the trial court's discretion in denying forcause challenges of jurorsanother issue. Further it is clear that a failure of the defendant to exhaust his peremptory challenges has factored into change of venue analysis in several previous cases. See, e.g., Rice, 120 Wash.2d at 557-59, 844 P.2d 416; State v. Jeffries, 105 Wash.2d 398, 409, 717 P.2d 722 (1986); State v. Maupin, 63 Wash. App. 887, 822 P.2d 355 (1992). This is not a situation where Clark ran out of peremptory challenges trying to seat a jury that was not biased against him due to pretrial publicity.
g. Government connection with the publicity
Clark contended that much media content must have come from the police, as "only the police had the statements to release." Br. of *1021 Appellant at 115. The trial court found, and the state argues, that media reporting about the case came from public records and from statements made in judicial proceedings. This factor does not militate against the trial court's decision.
h. Severity of charge against defendant
Aggravated first degree murder is the most severe charge in Washington. This factor militates in favor of a change of venue.
i. Size of area from which jury panel is drawn
Snohomish County is large. It was the third largest county in the state in 1997. Br. of Resp't at 51 (citing Office of Financial Management, 1997 Data Book at 248). Its population, from which the jury panel was drawn, was 551,200. Id. This factor weighs against a change of venue.
Only factors (b) and (h) would tend to militate toward a change of venue. Thus this case is not, as urged by Clark, like Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), where the United States Supreme Court overturned a conviction where, due to inflammatory pretrial publicity, 8 of 12 jurors had formed an opinion about guilt prior to trial. This case is more like Maupin or Jeffries, where only a small number of prospective jurors after a significant lapse in time held strong prejudices based on pretrial publicity. In those cases, like this one, the defendant did not exhaust his peremptory challenges. And in those cases, the appellate court did not find an abuse of discretion in the trial court's refusal to grant a change of venue. Nor do we here find an abuse of discretion.
5. Preliminary Instruction of Court Concerning Prior Appeal
Before the trial got under way, Judge Thorpe instructed the jury as follows:
The State requested the death penalty. The trial was delayed while an appeal was taken concerning whether the State could properly seek the death penalty.
RP (Feb. 27, 1997) at 8 (jury orientation). Clark claims this comment was inconsistent with the heightened "need for reliability in the determination that death is the appropriate punishment in a specific case" inherent in the Eighth Amendment, Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), because it impermissibly shifted in the jury's mind the ultimate responsibility for imposing the death penalty from the jury to an appellate court. See Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Additionally, Clark claims the comment was an impermissible judicial comment on the evidence barred by article IV, section 16, of the Washington Constitution.
Even if Clark were correct that the judge's instruction violated Caldwell or was an impermissible comment on the evidence, it would not change the outcome of our decision. Any prejudice that may have resulted from the jury being told an appellate court found the prosecution could "properly" seek the death penalty in Clark's case would logically carry over into the penalty phase of the trial. The judge did not instruct the jury that another court had found the prosecution could "properly" seek a guilty or innocent verdict. As we are reversing Clark's death sentence on other grounds, our disposition would not change were we to accept Clark's contention.
6. Jury Selection Challenges
Clark argues that the trial court erred in denying certain of his juror challenges for cause, and in granting certain of the state's challenges for cause, and that such rulings denied Clark's constitutional right to a fair and impartial jury.
At the threshold this issue is not properly raised because Clark accepted the jury as ultimately empaneled and did not exercise all of his peremptory challenges. Under well-settled case law, Clark can therefore show no prejudice based on the jury's composition. State v. Tharp, 42 Wash.2d 494, 500, 256 P.2d 482 (1953) (defendant must show the use of all his peremptory challenges or he can show no prejudice arising from the selection and retention of a particular juror and is barred from any claim or error in this regard); State v. Collins, 50 Wash.2d 740, *1022 744, 314 P.2d 660 (1957) (no prejudicial error where defendant accepted the jury while having available peremptory challenges; nor did he challenge the panel); State v. Robinson, 75 Wash.2d 230, 231-32, 450 P.2d 180 (1969) (no prejudice may be shown where defendant failed to use all of his peremptory challenges); Gentry, 125 Wash.2d at 616, 888 P.2d 1105 (where defendant participated in selecting and ultimately accepted jury panel, his constitutional right to an impartial jury selected by him was not violated). We most recently reiterated this rule in State v. Elmore, 139 Wash.2d 250, 277, 985 P.2d 289 (1999), cert. denied, 531 U.S. 837, 121 S.Ct. 98, 148 L.Ed.2d 57 (2000).
Clark seeks to distinguish this weight of authority by arguing that in his case the court used the "struck" method of voir dire[3] by which Clark knew ahead of time which juror would be seated had he exercised his final peremptory challenge. The prospective juror Clark was concerned about was Richard Lippincott (number 82) whose responses during voir dire seemed to indicate, although not unequivocally, that he would vote for a death sentence automatically upon a finding of guilty. As Clark thought Mr. Lippincott was the next juror to be seated should he exercise his final peremptory, Clark held back and used a peremptory challenge set aside for alternate jurors to keep Mr. Lippincott from serving as an alternate on the jury. Therefore Clark claims his defense, "while technically exercising only 11 of [his] 12 peremptory challenges, effectively used [his] final peremptory challenge to exclude Mr. Lippincott from sitting on the jury." Br. of Appellant at 139-40. However Clark does not brief, argue, or cite to any authority which would except the "struck" method of jury selection from the basic and well-established principle requiring the use of all peremptory challenges in order to show prejudice from the composition of a particular jury. Moreover, the state challenged in its brief and at oral argument the fact that Mr. Lippincott was indeed the next juror to be seated; rather the state claimed juror Dorothy Peterson (number 76) was next in line. Br. of Resp't at 55. In response, counsel for Clark conceded at oral argument that in fact Ms. Peterson was next in line. See RP (Mar. 26, 1997) at 2828 (voir dire of prospective jurors) ("THE COURT: That would mean that our alternates would be Ms. Peterson, Mr. Jones and Mr. Lippincott. They are the next three in line.").
In this case, Clark did not challenge any of the ultimately seated jurors for cause, nor did he use an available peremptory challenge against any of them. As any claim that the jury was not impartial must focus on the jurors who ultimately sat, Ross v. Oklahoma, 487 U.S. 81, 86, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and as Clark had apparently not expressed dissatisfaction with any jurors actually seated, we do not review the merits of this claim.
B. GUILT PHASE ISSUES
1. Pre-Arrest Silence
Clark claims the state introduced evidence of his pre-arrest silence in an attempt to persuade the jury of his guilt. Both Clark and the state agree that the Fifth Amendment prevents the state from commenting on "the silence of the defendant so as to infer guilt from a refusal to answer questions." State v. Lewis, 130 Wash.2d 700, 705, 927 P.2d 235 (1996). This rule equally bars the use of pre-arrest silence as evidence of guilt. State v. Easter, 130 Wash.2d 228, 238-39, 922 P.2d 1285 (1996).
Here the dispute centers on the character of Clark's purported silence. After Clark returned from the campsite on the afternoon of April 1, 1995, he and his aunt Vicki Smith *1023 drove to the police station in Everett ostensibly to reproduce fliers regarding Doll's disappearance. At the police station, Clark and Smith spoke briefly with Lieutenant Peter Hegge. Lieutenant Hegge told Clark and Smith that detectives were at the Doll-Iffrig residence interviewing everyone who might have information relevant to the search for Doll. He asked Smith and Clark to go to the Doll-Iffrig house and talk to the detectives. Clark agreed to drive Smith (who was reportedly heavily intoxicated) and himself there. Although he drove to the Doll-Iffrig house, he did not stop there. He and Smith noticed a large number of police personnel at the residence. As to why he did not stop, Clark told Smith he did not stop because he did not have a driver's license. When Detective Herndon spoke with Clark the next day, April 2, 1995, he claimed he did not stop at the house because he was low on gas and could not make it out to the house. Detective Herndon asked Clark why he had not paged himHerndon noticed his pager number written on Clark's hand, and had apparently requested a page previouslyand Clark noted he did not want to hassle with the police.
It would appear Clark's characterization of these events as pre-arrest silence is not entirely correct. He volunteered to speak with Lieutenant Hegge and Detective Herndon. He told Lieutenant Hegge he would go to the Doll-Iffrig house on April 1, 1995; he told his aunt, traveling with him, he did not stop because he had no license. The next day he changed his story and told Detective Herndon he did not come out because he was low on gas.
When a defendant does not remain silent and instead talks to police, the state may comment on what he does not say. State v. Young, 89 Wash.2d 613, 621, 574 P.2d 1171 (1978) (citing State v. Osborne, 50 Ohio St.2d 211, 216, 364 N.E.2d 216 (1977), vacated on other grounds by 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1157 (1978)). False information given to the police is considered admissible as evidence relevant to defendant's consciousness of guilt. State v. Allen, 57 Wash.App. 134, 143, 787 P.2d 566, 788 P.2d 1084 (1990).
Here Clark spoke with police on two occasions prior to arrest, and developed a conflicting account of why he did not follow Lieutenant Hegge's instructions to meet with detectives at the Doll-Iffrig house. This is not apparently a matter of pre-arrest silence. There was no error.
2. Testimony of Jailhouse Informant
State's witness Eugene Hillius, a "jailhouse informant," testified that during two separate conversations with Clark at the Snohomish County Jail, Clark claimed, with respect to Roxanne Doll, "they took my DNA sample out of her butt," RP (Apr. 4, 1997) at 4639 (trial), and that Clark was upset his brother would not help him out by lying to the police about the presence of deer blood in Clark's van. Hillius testified that Clark, after revealing the DNA information, "[j]ust looked at me, justit was like I was looking like I could look right through him, which is unreal, like he didn't care, like there is no feelings there at all. I get kind of blown away." RP (Apr. 4, 1997) at 4640 (trial).
a. ER 608(b) impeachment
Clark contends the trial court erred in denying him the opportunity to impeach Hillius under ER 608(b) with specific instances of conduct underlying his 1993 convictions for theft and forgery. Clark argued those instances of conduct were probative of Hillius' truthfulness and would have assisted the jury in assessing his credibility.
Such evidence is admissible as follows:
Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which *1024 character the witness being cross-examined has testified.
ER 608(b). Thus allowing such testimony is within the discretion of the court and will be reviewed only for an abuse of discretion. Failing to allow cross-examination of a state's witness under ER 608(b) is an abuse of discretion if the witness is crucial and the alleged misconduct constitutes the only available impeachment. State v. York, 28 Wash. App. 33, 621 P.2d 784 (1980). The need for cross-examination on misconduct diminishes with the significance of the witness in the state's case. State v. Robinson, 44 Wash. App. 611, 622, 722 P.2d 1379 (1986). Once impeached, there is less need for further impeachment on cross. State v. Martinez, 38 Wash.App. 421, 424, 685 P.2d 650 (1984).
The state argues Hillius was not a crucial witness because the statements from Clark to which he testified were susceptible to innocent explanation. The state further argues that it impeached Hillius on cross with 36 instances of prior convictions, including the ones Clark has put at issue. As Hillius was not a crucial witness, and was effectively impeached on cross, the state concludes that it was within the trial court's discretion to deny cross-examination by Clark on the misconduct underlying certain of those convictions.
Here, the rule concerning use of prior convictions for witness impeachment is also relevant to the analysis.
For the purpose of attacking the credibility of a witness in a criminal or civil case, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness....
ER 609(a). Under this rule, "cross-examination regarding prior convictions is limited to the fact of the conviction, the type of crime, and the punishment." State v. Copeland, 130 Wash.2d 244, 284, 922 P.2d 1304 (1996). Further, under ER 609, "[t]he details of the acts leading to the prior convictions are not admissible." State v. Coles, 28 Wash.App. 563, 573, 625 P.2d 713 (1981). However these holdings are limited to an ER 609 analysis.
Judge Thorpe could have let prior misconduct in under ER 608(b) but chose not to. Given the fact that Hillius was impeached under ER 609 on direct examination by an enumeration of each of his 36 prior convictions, Judge Thorpe concluded further examination on the misconduct underlying some of those convictions would not be any more probative. That was not an abuse of discretion.
b. Did Hillius' testimony violate an order in limine and result in an unfair trial?
Before Hillius testified, the court granted a defense motion excluding from Hillius' testimony evidence of "personal habits of Mr. Clark, or [Hillius'] perception of Mr. Clark's mental state that he is losing it [due to stress stemming from the charges]." RP (Apr. 4, 1997) at 4624 (trial).
Clark argues Hillius' statement that, after saying police removed DNA evidence of Clark from Roxanne Doll's body, Clark "[j]ust looked at me, justit was like I was looking like I could look right through him, which is unreal, like he didn't care, like there is no feelings there at all," RP (Apr. 4, 1997) at 4640 (trial), violated the order in limine on mental state evidence described above. Clark's counsel did not object, however, when Hillius made that statement in court, and therefore the objection was raised for the first time on appeal contrary to RAP 2.5(a).
Nevertheless it is clear this testimony did not violate the order in limine. Clark was aware that Hillius had made a statement that Clark appeared to be under a lot of stress as a result of the charges and appeared to be losing it. Clark's counsel specified the scope of the motion in limine: "So I want it clear and when I said mental state, what I'm talking about is Mr. Hillius' view that Mr. Clark was under a great deal of stress because of the charges. I think his term was losing it." RP (Apr. 4, 1997) at 4623-24 (trial). The court granted this motionthat Hillius may not "chat about the personal habits of Mr. Clark, or his perception of Mr. Clark's mental state that he is losing it[.]" Id. at 4624.
*1025 Hillius' testimony did not violate this order in limine because he did not testify about Clark's mental state, or say anything about the stress Clark was reportedly under. The most correct characterization of Hillius' testimony is that he spoke to Clark's demeanor as Clark told the witness "they took my DNA sample out of her butt." Id. at 4639. This is similar to the demeanor testimony of the paramedic in Stenson, 132 Wash.2d at 720-22, 940 P.2d 1239 (paramedic testified defendant was calm and showed no grief when told his wife was dying). Such testimony is proper if based upon personal observation of the defendant's conduct. Id. at 724, 940 P.2d 1239. Here Hillius recounted his personal observation and laid a factual foundation for this observation.
As noted, Clark's counsel did not object to the testimony at trial and did not move for a mistrial after the testimony. There was no error on this issue.
3. Motion to Dismiss for Insufficient Evidence of Premeditation
Clark moved to dismiss the charge of first degree murder at the end of the state's case, claiming the state had failed to provide sufficient evidence of the premeditation element. Clark asks us to vacate and dismiss his conviction for a new trial, or alternatively vacate and remand for sentencing for second degree murder.
Evidence of a charge or an element of a charge is sufficient if, viewed in the light most favorable to the state, a rational trier of fact could have found guilt beyond a reasonable doubt. Gentry, 125 Wash.2d at 596, 888 P.2d 1105. All reasonable inferences from the evidence must be drawn in favor of the state and interpreted most strongly against the defendant. Id. at 597, 888 P.2d 1105. Premeditation may be proved by circumstantial evidence where the inferences drawn by the jury are reasonable and the evidence supporting the jury's finding is substantial. Id. at 598, 888 P.2d 1105.
We went on to note in Gentry that:
This court has held that evidence of strangulation, alone, does not support an inference of premeditation. However, sufficient evidence to infer premeditation has been found where (1) multiple wounds were inflicted; (2) a weapon was used; (3) the victim was struck from behind; and (4) there was evidence of a motive, such as robbery or sexual assault. Sufficient evidence to infer premeditation also has been found where multiple wounds were inflicted by a knife procured at the site of the killing, the killing took place in a room away from the kitchen, where the knife was found, where the victim was struck in the face and where the evidence indicated that the victim had engaged in a prolonged struggle.
Id. at 599, 888 P.2d 1105 (footnotes omitted) (citing State v. Bingham, 105 Wash.2d 820, 826, 719 P.2d 109 (1986); State v. Ollens, 107 Wash.2d 848, 853, 733 P.2d 984 (1987); State v. Ortiz, 119 Wash.2d 294, 312-13, 831 P.2d 1060 (1992)).
The state put on evidence in this case similar to that in Gentry. Roxanne Doll was killed with a knife and was stabbed at least seven times in the neck. Cuts on her hands indicated a defensive struggle, and she was sexually assaulted.
This case is therefore similar to Gentry. There Gentry attempted to sexually assault the victim, a young girl, and killed her with 8 to 15 blows from a rock he had picked up at the scene. We found this evidence sufficient for premeditation. Gentry, 125 Wash.2d at 599-601, 888 P.2d 1105.
The trial court properly denied Clark's motion to dismiss.
4. Defense Instruction on Premeditation
Clark contends the trial court erred in giving the following instruction on premeditation:
Instruction number 11: Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditation. Premeditation must involve more than a moment in point of time. The law requires some time, however long *1026 or short, in which a design to kill is deliberately formed.
RP (Apr. 14, 1997) at 5434 (trial). This instruction is virtually identical to 11 Washington Pattern Jury Instructions: Criminal 26.01.01 (2d ed. 1994) (WPIC), but the latter substitutes "premeditated" in the second sentence for "premeditation."
Clark's proposed instruction number 5 included the same information but added that premeditation "involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." RP (Apr. 11, 1997) at 5416 (trial).
As Clark concedes, Br. of Appellant at 158, this court has had numerous occasions to invalidate the court's instruction and has not done so-going so far as to state that further challenge to the instruction is frivolous. In re Personal Restraint of Lord, 123 Wash.2d 296, 317, 868 P.2d 835, 870 P.2d 964 (1994) (Lord II); State v. Benn, 120 Wash.2d 631, 657-58, 845 P.2d 289 (1993); State v. Rice, 110 Wash.2d 577, 757 P.2d 889 (1988). Nevertheless Clark urges us to evaluate his argument that the instruction as given places an "over-emphasis on the briefness of the time necessary to premeditate and ... minimiz[es] the amount of deliberation (any) that must occur before intent becomes premeditation." Br. of Appellant at 158. Clark's concern is that the instruction erroneously emphasizes that premeditation can occur quickly, with minimal deliberation, prior to the killing.
We have rejected the precise formula Clark advanced in his proposed instruction on premeditation in Rice, 110 Wash.2d at 603-04, 757 P.2d 889, in favor of WPIC 26.01.01. Clark does not present a compelling argument why we should reject the holdings from Rice, Benn, and Lord II. Indeed, it is hard to tell from the face of the WPIC instruction how Clark's proposed language adds anything of substance. The inference Clark draws from the given instruction is not the only way, or even the most reasonable way, to construe the instruction.
The test for sufficiency of jury instructions is whether "they permit each party to argue his theory of the case, are not misleading, and when read as a whole, properly inform the trier of fact of the applicable law." Rice, 110 Wash.2d at 603, 757 P.2d 889 (citing State v. Mark, 94 Wash.2d 520, 526, 618 P.2d 73 (1980)). Instruction number 11, as given, provides ample room for Clark to argue his theory of the case. It is not misleading, and it remains a correct statement of the law. We reject this argument now as we have in the past.
5. Cumulative Error
Clark argues cumulative error during the guilt phase unconstitutionally prevented a fair trial. The lone Washington case to which Clark directs our attention in this catch-all issue, State v. Coe, 101 Wash.2d 772, 789, 684 P.2d 668 (1984), is a case where cumulative error was found to necessitate a new trial. However in Coe the court actually found numerous errorseven if, standing alone, harmless errorsduring the trial. Here, Clark has alleged but not satisfactorily demonstrated any errors to accumulate. Further, beyond directing our attention to "all" issues, Clark does not point us toward any particular error or set of errors. The state claims any alleged errors, individually or collectively, were harmless in light of the overwhelming evidence of Clark's guilt beyond a reasonable doubt. As we have found no errors with respect to the guilt phase, we find no cumulative error to have denied Clark of a fair trial.
C. SHACKLING DURING GUILT AND PENALTY PHASES
The court ordered Clark to appear in shackles on the first day of voir dire. He was not shackled for the remainder of the guilt phase but was again shackled when the verdict was read, and throughout the special sentencing proceeding. Clark claims this restraint violated his rights to a fair trial and sentencing, and constituted an impermissible judicial comment on the evidence. Without reaching the question of whether the shackling was an impermissible judicial comment, we agree that shackling Clark was constitutional error. However, we find the shackling error harmless.
*1027 Our analysis on this point need go back no further than our decision in State v. Finch, 137 Wash.2d 792, 842, 975 P.2d 967, cert. denied, 528 U.S. 922, 120 S.Ct. 285, 145 L.Ed.2d 239 (1999), where we restated the long-standing rule in this jurisdiction and many others is that a defendant in a criminal case is entitled to appear at trial free from all bonds or shackles except in extraordinary circumstances. See, e.g., Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); State v. Hartzog, 96 Wash.2d 383, 635 P.2d 694 (1981); State v. Ollison, 68 Wash.2d 65, 411 P.2d 419 (1966); State v. Sawyer, 60 Wash.2d 83, 371 P.2d 932 (1962); State v. Williams, 18 Wash. 47, 50 P. 580 (1897); State v. Tolley, 290 N.C. 349, 226 S.E.2d 353 (1976); Snow v. Oklahoma, 489 F.2d 278 (10th Cir.1973); Kennedy v. Cardwell, 487 F.2d 101 (6th Cir.1973); United States ex rel. Stahl v. Henderson, 472 F.2d 556 (5th Cir.1973); United States v. Roustio, 455 F.2d 366 (7th Cir.1972); Dorman v. United States, 435 F.2d 385 (D.C.Cir.1970); United States v. Thompson, 432 F.2d 997 (4th Cir.1970); United States v. Samuel, 431 F.2d 610 (4th Cir.1970); Loux v. United States, 389 F.2d 911 (9th Cir. 1968); Blaine v. United States, 136 F.2d 284 (D.C.Cir.1943); People v. Thomas, 1 Mich. App. 118, 134 N.W.2d 352 (1965); Commonwealth v. Brown, 364 Mass. 471, 305 N.E.2d 830 (1973); State v. Borman, 529 S.W.2d 192 (Mo.Ct.App.1975); State v. Roberts, 86 N.J.Super. 159, 206 A.2d 200 (1965); French v. State, 377 P.2d 501 (Okla.Crim.App.1962); Commonwealth v. Cruz, 226 Pa.Super. 241, 311 A.2d 691 (1973); Thompson v. State, 514 S.W.2d 275 (Tex.Crim.App.1974); Sparkman v. State, 27 Wis.2d 92, 133 N.W.2d 776 (1965).
This rule is to ensure a fair and impartial trial under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 3, and article I, section 22, of the Washington Constitution. See Holbrook v. Flynn, 475 U.S. 560, 567, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); Estelle v. Williams, 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); Hartzog, 96 Wash.2d at 398, 635 P.2d 694.
In Finch we explained:
"A trial judge must exercise discretion in determining the extent to which courtroom security measures are necessary to maintain order and prevent injury. That discretion must be founded upon a factual basis set forth in the record. A broad general policy of imposing physical restraints upon prison inmates charged with new offenses because they may be `potentially dangerous' is a failure to exercise discretion."
Finch, 137 Wash.2d at 846, 975 P.2d 967 (quoting Hartzog, 96 Wash.2d at 400, 635 P.2d 694). Furthermore "this court and courts of other jurisdictions have universally held that restraints should `be used only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape.'" Id. (quoting Hartzog, 96 Wash.2d at 398, 635 P.2d 694).
Finch was shackled during the entire trial and special sentencing proceeding, and was further restrained during certain witness testimony by use of handcuffs. Finch, 137 Wash.2d at 850, 975 P.2d 967. The trial court's reasoning was based on Finch's large size and threatening remarks he had made with respect to certain witnesseswitnesses during whose testimony he was further restrained by handcuffs. Id. at 850-52, 975 P.2d 967. Contrary to the trial court's reasoning, we thought, was the fact that Finch had no history of violence or escape in custody, and observed courtroom decorum while appearing for many pretrial hearings. Id. at 852, 975 P.2d 967. As the trial judge made no finding that Finch was an escape risk, an imminent threat to those in the courtroom, or that he was a disruptive presence, we found his shackling during the trial and sentencing to be an abuse of discretion a "clear error." Id. at 862, 975 P.2d 967.
Here, Clark was shackled when entering the jury auditorium on the first day of voir dire, in front of the entire jury venire. Despite defense counsel's objection, the trial court found the jury venire would not be able to see Clark actually in shackles. However we think it clear, as we did in Finch, that the jury could infer shackling from Clark's stilted and restrained movement. "The jury *1028 could observe the impact of the restraints because the Defendant's walk was slow, his stride obviously shortened." Finch, 137 Wash.2d at 858, 975 P.2d 967.[4] Here, the court overruled counsel's objection without entering any findings or making any statements that would lead us to believe he considered shackling an impelling necessity or whether there were less restrictive means of achieving whatever result was desired by the shackling.
The state concedes the trial court went through no individualized assessment of the need for shackling. Br. of Resp't at 88. The state directs us to no evidence in the record, nor do we find any, that would imply Clark posed a threat of violence, escape, or disruption. Nor was there evidence of anything other than decorous behavior during pretrial hearings. Therefore the logic of Finch leads us to conclude Clark's shackling at points during the guilt phase was constitutional error and therefore presumptively prejudicial.
With respect to the shackling on the day the verdict was returned, and throughout the special sentencing proceeding, Finch again controls. Like Finch, Clark was shackled throughout the sentencing phase. We found Finch's shackling inherently prejudicial. Finch, 137 Wash.2d at 865-66, 975 P.2d 967; see also Duckett, 67 F.3d at 748 ("Unlike prison clothes, physical restraints may create the impression in the minds of the jury that the court believes the defendant is a particularly dangerous and violent person. Therefore, in the absence of a compelling need to shackle the defendant during his sentencing hearing, such a practice is inherently prejudicial."); Tyars v. Finner, 709 F.2d 1274 (9th Cir.1983) (when a defendant's level of dangerousness is at issue, it is a violation of due process to force the defendant to appear in restraints); Elledge v. Dugger, 823 F.2d 1439, 1450-51 ("[A] jury might view the shackles as first hand evidence of future dangerousness and uncontrollable behavior which if unmanageable in the courtroom may also be unmanageable in prison, leaving death as a proper decision."), opinion withdrawn in part on other grounds on denial of rehearing by 833 F.2d 250 (11th Cir.1987). Applying the analysis of Finch, it follows that here, where no balancing or analysis as to the need to restrain Clark was done, his shackling was constitutional error.
However a claim of unconstitutional shackling is subject to a harmless error analysis. Elmore, 139 Wash.2d at 274, 985 P.2d 289 (citing Finch, 137 Wash.2d at 859-62, 975 P.2d 967). The state argues that Clark's shackling was harmless error on each occasion in light of overwhelming evidence of his guilt. The overwhelming evidence in this case is claimed to be the DNA linking Clark to the crime, his lack of a credible alibi, and his efforts to conceal the crime.
The test for harmless error is whether the state has overcome the presumption of prejudice when a constitutional right of the defendant is violated when, from an examination of the record, it appears the error was harmless beyond a reasonable doubt, State v. Belmarez, 101 Wash.2d 212, 216, 676 P.2d 492 (1984), or whether the evidence against the defendant is so overwhelming that no rational conclusion other than guilt can be reached. State v. Guloy, 104 Wash.2d 412, 425, 705 P.2d 1182 (1985). But see United States v. Hasting, 461 U.S. 499, 516, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (Stevens, J., concurring) ("A federal appellate court should not find harmless error merely because it believes that the other evidence is `overwhelming'.... `The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.'") (quoting Kotteakos v. United States, 328 U.S. 750, 763-64, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).
In the guilt phase, Clark was shackled on the first day of voir dire and the day the verdict was returned, but sat unrestrained in-between. From this, two observations follow. First, Clark was not shackled throughout the two-and-a-half-week trial (unlike Finch, who sat throughout his trial in restraints). Second, the jury had already *1029 arrived at its verdict of guilt or innocence prior to the second time they saw Clark shackled. Because the impact of shackling on the presumption of innocence is the overarching constitutional concern, it would logically follow that in the minds of the jurors Clark's shackling on the first day of voir dire was more than logically offset by over two weeks of observing Clark in the courtroom without shackles. See Dennis J. Sweeney, An Analysis of Harmless Error in Washington: A Principled Process, 31 Gonz. L.Rev. 277 (1996) (advocating a theory of harmless error that takes into account the logical connection of a putative error with the outcome of a trial). Furthermore the presumption of innocence was not at stake on the day the verdict was read because the jury had already judged Clark guilty. Therefore we can say Clark's shackling on the first day of voir dire and the day of the verdict was harmless error beyond a reasonable doubt.
As for the harmless error analysis regarding the sentencing phase, on June 13, 2000, we remanded the case for determination of whether it was possible
1. [F]or the jury to see or infer that the defendant was restrained when entering, leaving, or sitting in the hearing room during the penalty phase?
2. [T]o know the defendant was restrained in any way based on a restriction of his movements by seeing the defendant in motion at any point during the penalty phase?
State v. Clark, Order For Remand Hearing (June 13, 2000). The trial court conducted a reference hearing and submitted findings of fact answering both questions in the negative. Id., Findings Of Fact Re: Reference Hearing (Oct. 31, 2000). According to the trial court the jurors were never present when Clark entered or left during the penalty phase, a protective skirt concealed the shackles at counsel table, and Clark never moved from his seat during the penalty phase except to stand for the entry of the judge and jury. Id.
In Finch it was "`clear that the defendant's movements were restricted,'" and "clearly possible that the jury could have known that the Defendant was restrained." Finch, 137 Wash.2d at 857, 975 P.2d 967, and id. (quoting RP (Remand Hearing) at 12). Here there appears to be no such possibility. The trial court made sure Clark was not moved in or out of the room in the presence of the jury, both counsel tables had protective skirts, the shackles were taped to eliminate any noise, and the jury never saw Clark in motion during the guilt phase. Clark, Findings Of Fact Re: Reference Hearing at 1-3.
Therefore, although Clark's shackling during both the guilt and penalty phases was constitutional error because no appropriate individualized assessment took place, we find he was not prejudiced and hold the error harmless beyond a reasonable doubt.
D. EVIDENCE OF PRIOR CRIMINAL HISTORY DURING PENALTY PHASE
Clark argues the trial court erred by allowing the state to introduce evidence of facts surrounding his 1988 conviction for unlawful imprisonmentevidence the trial court ruled was inadmissible in the guilt phase. Specifically, the state was allowed to present evidence to the jury that the victim of the unlawful imprisonment was a four-year-old girl, in fact Clark's neighbor. Clark contends this evidence is plainly inadmissible in the special sentencing hearing under State v. Bartholomew, 98 Wash.2d 173, 654 P.2d 1170 (1982) (Bartholomew I), vacated on other grounds by 463 U.S. 1203, 103 S.Ct. 3530, 77 L.Ed.2d 1383 (1983), aff'd on remand, 101 Wash.2d 631, 683 P.2d 1079 (1984) (Bartholomew II), because it was unfairly prejudicial to Clark.
The state argues it only sought to evince "a few basic facts" surrounding the 1988 conviction and that, under State v. Pirtle, 127 Wash.2d 628, 669-70, 904 P.2d 245 (1995), such underlying information would be admissible. Alternatively, the state invites us to overrule Bartholomew II on the ground that the mode of constitutional analysis set forth in State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986) and subsequent federal constitutional developments have rendered our holding obsolete.
*1030 We do not accept the state's invitation to overrule Bartholomew II. We will overrule prior decisions only upon "a clear showing that an established rule is incorrect and harmful." State v. Berlin, 133 Wash.2d 541, 547, 947 P.2d 700 (1997). Although we have added texture to the Bartholomew II framework in subsequent death penalty cases, Lord, 117 Wash.2d at 889-92, 822 P.2d 177; Gentry, 125 Wash.2d at 602-23, 888 P.2d 1105, we have recognized the rule without casting doubt on its continued validity. Gentry, 125 Wash.2d at 622-23 n. 78, 888 P.2d 1105; see also Elmore, 139 Wash.2d at 287-88, 985 P.2d 289; State v. Brown, 132 Wash.2d 529, 622, 940 P.2d 546 (1997); Pirtle, 127 Wash.2d at 663-71, 904 P.2d 245; State v. Brett, 126 Wash.2d 136, 182-85, 892 P.2d 29 (1995); In re Personal Restraint of Lord, 123 Wash.2d 296, 320-23, 868 P.2d 835, 870 P.2d 964 (1994) (Lord II); State v. Furman, 122 Wash.2d 440, 470, 858 P.2d 1092 (1993) (Utter, J., concurring); State v. Gonzalez, 110 Wash.2d 738, 751, 757 P.2d 925 (1988); State v. Rice, 110 Wash.2d 577, 609, 757 P.2d 889 (1988); State v. Rupe, 108 Wash.2d 734, 760-62, 743 P.2d 210 (1987) (Rupe II); State v. Kwan Fai Mak, 105 Wash.2d 692, 717-18, 718 P.2d 407 (1986); State v. Jeffries, 105 Wash.2d at 416, 717 P.2d 722; State v. Campbell, 103 Wash.2d 1, 28, 691 P.2d 929 (1984); (Rupe I, 101 Wash.2d at 691, 683 P.2d 571). Despite the state's Gunwall analysis to the contrary, Br. of Resp't at 107-17, it is far from clear that Bartholomew II has been incorrect or harmful. We decline the invitation to deploy such a "fundamental change[ ] in the jurisprudence of capital sentencing law in this state," and adhere to the rule we recognized in Bartholomew II and subsequent cases. Gentry, 125 Wash.2d at 623, 888 P.2d 1105.
RCW 10.95.070, entitled "Special sentencing proceedingFactors which jury may consider in deciding whether leniency merited," provides:
In deciding the question posed by RCW 10.95.060(4), the jury, or the court if a jury is waived, may consider any relevant factors, including but not limited to the following:
(1) Whether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity;

....
(Emphasis added.)
In Bartholomew II, then, we held
the due process and cruel punishment provisions of this state's constitution are offended ... in any case involving capital punishment by (1) allowing the introduction of any evidence regardless of its admissibility under the rules of evidence, including hearsay evidence, and (2) by allowing evidence of defendant's prior criminal activity regardless of whether defendant was charged or convicted as a result of such activity.
Bartholomew II, 101 Wash.2d at 640, 683 P.2d 1079. We explained our rationale as follows:
Since the death penalty is the ultimate punishment, due process under this state's constitution requires stringent procedural safeguards so that a fundamentally fair proceeding is provided. Where the trial which results in imposition of the death penalty lacks fundamental fairness, the punishment violates article 1, section 14 of the state constitution.
We deem particularly offensive to the concept of fairness a proceeding in which evidence is allowed which lacks reliability. The rules of this court concerning admissibility of evidence are premised on allowing evidence which is trustworthy, reliable, and not unreasonably prejudicial. See ER 403. The purpose of the rules of evidence is to afford any litigant a fair proceeding. See ER 102.
Bartholomew II, 101 Wash.2d at 640, 683 P.2d 1079. Part and parcel of that constitutional guarantee of fairness, we explained, was the requirement that the statutory mandates under RCW 10.95.060(3) to admit "any relevant evidence" during the special sentencing proceeding, and under RCW 10.95.070 for the jury to consider "any relevant factors" must be limited to mitigating factors. The admission by the court and *1031 consideration by the jury of aggravating factors, on the other hand
must be restricted to meet the evidentiary, and state and federal constitutional standards we have articulated. Specifically, evidence of nonstatutory aggravating factors must be limited to defendant's criminal record, evidence that would have been admissible at the guilt phase, and evidence to rebut matters raised in mitigation by the defendant.
Bartholomew II, 101 Wash.2d at 642, 683 P.2d 1079. By "criminal record" we meant in Bartholomew I that only the defendant's "record of convictions" would be admissible. Bartholomew I, 98 Wash.2d at 197, 654 P.2d 1170; see also Brown, 132 Wash.2d at 622, 940 P.2d 546 (prior conviction evidence constitutionally permissible when limited to record of convictions). On its face this holding would not allow evidence of facts underlying the convictions, but only evidence of the convictions themselves.
In Lord II we distinguished between admissible evidence of "convictions" as used in the Bartholomew opinions from inadmissible "allegations of criminal activity." 123 Wash.2d at 322, 868 P.2d 835. Thus we allowed in the penalty phase evidence of a finding of guilt in juvenile court even though it wasn't technically a "conviction." Id. The issue of just how much evidence beyond the adjudication we would countenance did not surface.
In Gentry we allowed the admission of a certified copy of a prior conviction and sentence, over the defense's objection that the sentence exceeded the scope of Bartholomew II as Gentry received an exceptional sentence. Gentry, 125 Wash.2d at 637-38, 888 P.2d 1105. Gentry argued that the fact he was sentenced to a longer sentence than statutorily required for his prior conviction was prejudicial. We dispelled this argument, noting that "[e]vidence is not excluded because it is `prejudicial' but because it is unfairly prejudicial." Id. at 637, 888 P.2d 1105 (citing In re Personal Restraint of Lord, 117 Wash.2d 829, 891, 822 P.2d 177 (1991) (Lord I)). We believed the nature of the sentence went to the nature and extent of the conviction, and as such was not unfairly prejudicial under Bartholomew II or Lord I.
In Pirtle we were faced with the issue, as present here, of "exactly how much data about a prior conviction [are] admissible in the State's penalty phase case." Pirtle, 127 Wash.2d at 670, 904 P.2d 245. The state sought to admit evidence of a prior conviction for assault by way of a certified copy of the information charging the prior crime.[5] The information established the assault was accomplished by use of a "`weapon, namely, a glass, by hitting Chris Mabrey in the face with the glass causing severe lacerations to his face.'" Id. (quoting State's Ex. 191). We asked whether admission of these additional facts contained in the information caused Pirtle undue prejudice. We determined they did not, stating the information
may have more probative value as the defendant's criminal history when there are alternative means of committing the same crime, because it shows what means were actually used by the defendant. Assault, the crime at issue here, can be committed in a number of different ways. The information here did little more than to inform the jury that this assault resulted in substantial bodily harm and involved the use of a deadly weapon.... [The information] simply stated the particular elements of the crime which was the basis for the conviction.
Pirtle, 127 Wash.2d at 670-71, 904 P.2d 245. Thus we concluded
It is difficult to see how an information setting forth the name and elements of a charged crime is inherently more prejudicial to the Defendant than the judgment and sentence normally admitted....
....

Bartholomew does not prohibit the introduction of this information, which simply stated the particular elements of the crime which was the basis for the conviction.
Id.
What happened in the case at bar was quite different. Not only was a certified *1032 copy of the judgment and sentence for the conviction entered, RP (Apr. 16, 1997) at 5566-67, but a police officer from the Everett Police Department was permitted to testify from a police statement that the victim of the unlawful imprisonment was a four-year-old girl who was a neighbor to Clark. RP (Apr. 16, 1997) at 5625 (penalty phase). This testimony was offered to prove more than the fact of a conviction and more than the elements of the offense.
This evidence, presented during the state's case in chiefand therefore not in rebuttal went beyond the Bartholomew II boundaries, even as widened in Pirtle. Pirtle dealt with an information that was deemed not unfairly prejudicial because it merely set forth the elements of the assault convictionthe attack which caused substantial bodily harm and the use of a deadly weapon.
The trial court erred by admitting this testimony for two reasons. First, it was inadmissible on its face because it went beyond the scope of the statute we have construed to allow introduction of only the record of conviction. If we allow narrative testimony of this kind there would be no foreseeable end to these trials within a trial. Second, it should have been excluded from evidence even if otherwise admissible because it was unduly prejudicial under the quasi 403 analysis Bartholomew II engenders. Bartholomew II, 101 Wash.2d at 640, 683 P.2d 1079. Evidence of the unlawful imprisonment victim's tender age and relationship to Clark did not go to the elements of unlawful imprisonment the knowing restraint of another person. RCW 9A.40.040.
One need not imprison a child, or be an acquaintance of the victim, in order to commit the crime of unlawful imprisonment. The age and relationship vis-à-vis Clark to the victim are not relevant. The prejudice is apparent when one recalls the predicate offense for which Clark was sentenced to death. On the face of it, this may have been the most prejudicial evidence entered in the sentencing phase against Clark, a bit of evidence which the jury could not have possibly disregarded.
Perhaps that is why the trial court did not allow the evidence to come out during the guilt phase, before paradoxically changing its position in the penalty phase. The prejudice of its admission became clear in the state's closing argument during the penalty phase, that "this defendant preys on the vulnerable and the weak and the small." RP (Apr. 17, 1997) at 5821 (penalty phase). We fear such evidence was too likely to short-circuit the jurors' reasoning and inflame their passions.
We therefore hold the admission of the police statement concerning the previous false imprisonment conviction, over and above the mere judgment and sentence for that crime, violated the Bartholomew II rule, was unfairly prejudicial, and requires vacating Clark's death sentence and remanding for a new special sentencing proceeding.
Given this disposition it is unnecessary to comment on other assignments of error relating to the penalty phase.

CONCLUSION
For the reasons set forth in this opinion, we affirm Clark's conviction for aggravated first degree murder, first degree kidnapping, and first degree rape. However, due to the trial court's violation of Bartholomew II during the penalty phase, we reverse his death sentence and remand to the trial court where, if the state desires, a new special sentencing proceeding may take place.
ALEXANDER, C.J., SMITH, JOHNSON and MADSEN, JJ., concur.
IRELAND, J. (dissenting)
The majority correctly addresses the guilt phase issues, but errs in its treatment of a key issue from the penalty phase of the trial. Specifically, the trial court did not err in admitting explanatory evidence regarding Richard Clark's conviction for unlawful imprisonment. I would affirm the Snohomish County Superior Court judgment and sentence.
The majority here concludes the trial court erred in allowing admission, over Clark's objection, of facts beyond the certified copy of the judgment and sentence in his 1988 conviction for unlawful imprisonment. Specifically, *1033 in the State's case-in-chief, an Everett police officer testified the victim of Clark's 1988 crime was a 4 year old neighbor girl, known to Clark. The majority concludes this evidence was inadmissible in the penalty phase of the trial under our holdings in State v. Bartholomew, 98 Wash.2d 173, 654 P.2d 1170 (1982) (Bartholomew I), vacated, 463 U.S. 1203, 103 S.Ct. 3530, 77 L.Ed.2d 1383 (1983), aff'd on remand, 101 Wash.2d 631, 683 P.2d 1079 (1984) (Bartholomew II). The majority is mistaken.
The starting place for any analysis of this issue is the death penalty statute itself. RCW 10.95.060 requires the jury that convicted a defendant of aggravated murder in the first degree to determine if leniency is appropriate. The State is obliged to prove the existence of aggravating factors under RCW 10.95.020. Then, the jury must answer the following statutory question:
Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?
RCW 10.95.060(4). As originally enacted, RCW 10.95.060(3) authorized the admission of a broad array of evidence related to the statutory question:
The court shall admit any relevant evidence which it deems to have probative value regardless of its admissibility under the rules of evidence, including hearsay evidence and evidence of the defendant's previous criminal activity regardless of whether the defendant has been charged or convicted as a result of such activity. The defendant shall be accorded a fair opportunity to rebut or offer any hearsay evidence.
Moreover, RCW 10.95.070 articulated a series of relevant factors the jury could consider in deciding whether leniency was merited. Among the factors was the following:
Whether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity[.]
RCW 10.95.070(1).
In Bartholomew I and II, we evidenced a concern about the breadth of RCW 10.95.060(3), holding it unconstitutional insofar as it had the potential to allow the introduction of evidence inadmissible under the Rules of Evidence, and it allowed nonconviction data to be considered as part of a defendant's criminal history. Bartholomew II, 101 Wash.2d at 641-44, 683 P.2d 1079. In Bartholomew II, we expressly clarified the proper treatment of the statutory provisions under chapter 10.95 RCW. The liberal authority of RCW 10.95.060(3) to receive "any relevant evidence" and RCW 10.95.070 to consider "relevant factors" is confined to mitigating evidence. Id. at 642, 683 P.2d 1079. The State can present any evidence during the penalty phase relating to the statutory aggravating factors of RCW 10.95.020, provided such evidence was admissible in the guilt phase. Id. at 643, 683 P.2d 1079. With respect to the "relevant factors" of RCW 10.95.070, the State's ability to present evidence is narrower than with respect to RCW 10.95.020 statutory aggravating factors.
Specifically, evidence of nonstatutory aggravating factors must be limited to defendant's criminal record, evidence that would have been admissible at the guilt phase, and evidence to rebut matters raised in mitigation by the defendant.
Bartholomew II, 101 Wash.2d at 642, 683 P.2d 1079.
Plainly, our concern with respect to evidence admissible as "relevant factors" under RCW 10.95.070 related to the difference between convictions and all other matters in a person's criminal history. Under Bartholomew I and II, evidence of criminal activity for which the defendant had not been charged and charges not resulting in a defendant's conviction would be inadmissible. However, conviction-related information would be admissible under Bartholomew I and II.
The majority here attempts to confine the State's proof of the defendant's conviction-related history under RCW 10.95.070 to that which is found in the certified copy of the judgment and sentencenothing more, nothing less. That has never been the law in the State of Washington.
As early as State v. Lord, 117 Wash.2d 829, 822 P.2d 177 (1991), cert. denied, 506 U.S. *1034 856, 113 S.Ct. 164, 121 L.Ed.2d 112 (1992), we held explanatory evidence regarding a criminal conviction may be utilized. In fact, in Lord, we held a California juvenile "adjudication" was admissible even though it was not technically a conviction. Moreover, in Lord the uncharged assault on the defendant's victim in the course of an unlawful imprisonment was admissible to impeach a witness's testimony. In State v. Gentry, 125 Wash.2d 570, 888 P.2d 1105, cert. denied, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 79 (1995), we held the admission of a certified copy of a judgment and sentence which indicated the defendant served an exceptional sentence was admissible. And, in State v. Pirtle, 127 Wash.2d 628, 904 P.2d 245 (1995), cert. denied, 518 U.S. 1026, 116 S.Ct. 2568, 135 L.Ed.2d 1084 (1996), we held the defendant's prior criminal history could be proved by admission of a certified copy of the information charging the crime. Thus, under Pirtle, the record of criminal history is not confined to a judgment and sentence, but may include explanatory information regarding the crime. The information in Pirtle referenced not only the general charge of assault, but also noted the defendant's assault conviction was accomplished by the use of a "`weapon, namely, a glass, by hitting Chris Mabrey in the face with the glass causing severe lacerations to his face.'" Pirtle, 127 Wash.2d at 670, 904 P.2d 245 (quoting State's Ex. 191). We noted the information was admissible because it
[M]ay have more probative value as the defendant's criminal history when there are alternative means of committing the same crime, because it shows what means were actually used by the defendant. Assault, the crime at issue here, can be committed in a number of ways. The information here did little more than to inform the jury that this assault resulted in substantial bodily harm and involved the use of a deadly weapon.
... [The information] simply stated the particular elements of the crime which was the basis for the conviction.
Pirtle, 127 Wash.2d at 670-71, 904 P.2d 245. Most recently, in State v. Stenson, 132 Wash.2d 668, 744-46, 940 P.2d 1239 (1997), cert. denied, 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998), we held juvenile and adult convictions that were inadmissible in other criminal cases pursuant to the Sentencing Reform Act of 1981, RCW 9.94A.360(2), were relevant and admissible in a capital case because
[the use of the convictions] is consistent with the purpose to guide and channel the jury's discretion because, along with evidence of mitigating circumstances, it provides the jury a broader understanding of the defendant's background and character.
Id. at 745, 940 P.2d 1239 (citing State v. Brett, 126 Wash.2d 136, 184, 892 P.2d 29 (1995), cert. denied, 516 U.S. 1121, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996)).
In effect, our case law has indicated that prior criminal history, specifically convictions, could be admitted in the State's case-in-chief during the penalty phase of a capital case. The criminal history could be proved in a variety of ways. Certainly, in Pirtle, we made it plain that where the charge conveyed little of the underlying facts involving the defendant's criminal history, other, more factually significant data could be conveyed to the jury regarding the defendant's prior criminal history, provided it was accurate and related only to a conviction, as opposed to an uncharged or unproven criminal act.
In the present case, we do not need to address the State's argument that Bartholomew I and II should be overruled. Under our case law, it is clear that limited conviction related evidence could be presented in the State's case-in-chief during the penalty phase of a capital case for purposes of RCW 10.95.070. Criminal history can be proved in a variety of ways and information regarding the prior convictions, if truthful, is relevant for the jury in its awful responsibility. The evidence presented by the State in its case-in-chief here, regarding Clark's 1988 unlawful imprisonment conviction, was appropriate. The evidence was accurate insofar as the conviction involved a 4 year old girl who was a neighbor of Clark's and known to him. The defense has not suggested this evidence was inaccurate in any respect.
Consequently, under Bartholomew I and II and Pirtle, this court should hold the trial *1035 court did not err in allowing this evidence, which explained the bare conviction for unlawful imprisonment to a panel of laypersons. However, the State's ability to present information relating to a defendant's conviction as part of his or her criminal history is not unlimited. The trial court should retain complete discretion in deciding whether the evidence is relevant to the jury's determination. The State's evidence may provide additional background information to the jury about a defendant's conviction when a judgment and sentence conveys nothing of the nature of the defendant's actual crime.
For the reasons set forth above, the trial court should be affirmed with respect to the admission of explanatory evidence regarding Clark's conviction for unlawful imprisonment in the penalty phase of the trial. Consequently, I would affirm Clark's conviction and the jury verdict in the special sentencing proceeding.
GUY, J.P.T., and BRIDGE, J.P.T., concur.
NOTES
[1] Indeed, Clark told the trial court at the hearing on his motion to quash the state's subpoena duces tecum, "[w]e believe that both producing any document or describing any circumstances with respect to the document would be some kind ofwould be potential of revealing secrets which [Clark] has requested that we not disclose." Verbatim Report of Proceedings (RP) (Nov. 16, 1995) at 5 (motion to compel discovery).
[2] Clark claims that had he exercised his 12th challenge, it would have assured the seating of a person who strongly favored imposing the death penalty automatically; this juror was one of seven prospective jurors for whom the trial court denied a defense challenge for cause. See Br. of Appellant at 117-18.
[3] Under [the "struck"] method, all prospective jurors are assigned consecutive numbers. The court then allows the prosecution an uninterrupted block of time to examine all prospective jurors in any order it chooses. Following the voir dire, peremptory challenges are exercised alternately in accordance with court rules. The allotted time may be divided into two segments. Similarly, the defense is allowed an equal amount of time to examine any prospective jurors. Because the jurors have consecutive numbers, prospective juror number 13 replaces the first juror excused from the first twelve jurors. Prospective juror number 14 replaces the next juror excused from the first twelve jurors, and so forth.

13 Royce A. Ferguson, Jr., Washington Practice: Criminal Practice and Procedure § 4002, at 165 (1997).
[4] It is worth noting the Ginni Stevens Auditorium was the same room used in Finchboth cases were tried in the Snohomish County Superior Court. Id. at 855, 975 P.2d 967.
[5] The defendant had entered a guilty plea in Montana to an assault charge before the judgment and sentence had been formally entered as of the date of Pirtle's trial in Washington.