# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58990-7-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| PARRIS D. MILLER, | |
| Appellant. | |

CHE, J. — Parris D. Miller appeals his convictions for one count of second degree murder, two counts of first degree unlawful possession of a firearm, and one count of attempting to elude a pursuing police vehicle. Miller had shot and killed a man and then led the police on a chase via vehicle and foot.

Miller's counsel and the State jointly requested a continuance, which the court granted after finding good cause. Miller was not present and his counsel indicated that they would notify him of the continuance. At the next hearing, Miller objected to the continuance and requested to proceed self-represented. The court denied Miller's motion to rescind the continuance order and found Miller knowingly and voluntarily waived his right to counsel. Thereafter, Miller twice expressed to have counsel reappointed. In both instances, the trial court denied Miller's request.

Immediately prior to trial, Miller attempted twice to escape the jail, which prompted the trial court to impose shackling requirements. While discussing voir dire, Miller attempted

multiple times to leave the courtroom, which led to increased and permanent shackling requirements. The jury convicted Miller.

At sentencing, Miller attended the hearing in person and restrained. The trial court, having previously conducted an individualized assessment of the need for restraints and determined that Miller would be restrained at all hearings, did not conduct a renewed assessment prior to the sentencing hearing. Miller did not object. The trial court sentenced Miller using an offender score that included juvenile adjudications and determined that he was indigent as defined in RCW 10.101.010(3)(a)-(d). The trial court also found that Miller's two counts of second degree murder merged and vacated Miller's second degree felony murder conviction. However, in its judgment and sentence, the trial court referenced the second degree felony murder conviction. The trial court also imposed a $500 crime victim penalty assessment (VPA).

Miller argues that the trial court (1) violated Miller's Sixth Amendment right to counsel by twice refusing to reappoint counsel, (2) violated Miller's state constitutional rights by requiring him to appear restrained at sentencing without conducting an individualized assessment, (3) erred in failing to apply a change to RCW 9.94A.525 when calculating Miller's offender score, (4) failed to strike the second degree felony murder conviction from Miller's judgment and sentence, and (5) impermissibly imposed the $500 VPA in Miller's judgment and sentence. Additionally, in a statement of additional grounds (SAG), Miller raises multiple claims.

We hold that the trial court neither violated Miller's Sixth Amendment rights nor erred in including Miller's juvenile convictions in his offender score for the present offenses. We accept the State's concessions that any reference to the second degree felony murder conviction and the

VPA should be stricken from Miller's judgment and sentence. Moreover, even if the trial court erred by not conducting another individualized assessment for shackling before sentencing, the State has shown any error was harmless beyond a reasonable doubt. Finally, we hold that Miller's SAG claims fail.

Accordingly, we affirm Miller's convictions, but remand for the trial court to strike references to Miller's second degree felony murder conviction and the $500 VPA from Miller's judgment and sentence.

FACTS

*Background*

In September 2022, Glennis Piper had a confrontation with someone while stopped at a gas station. The individual followed Piper in his vehicle to Piper's place of work. Once there, the individual confronted Piper again, pulled out a gun, and shot Piper before driving away. Piper later died at the hospital.

Law enforcement officers located the suspect vehicle and attempted to make contact. While in a marked vehicle with lights and sirens on, law enforcement officers observed the suspect vehicle increase its speed to a hundred miles per hour, run through red lights, weave in and out of traffic, and drive through parking lots to avoid traffic. The vehicle eventually stopped and the driver jumped out and ran away. Upon detention, law enforcement officers identified the driver as Miller.

The State charged Miller by second amended information with second degree murder (count 1), second degree felony murder (count 2), two counts of first degree unlawful possession

of a firearm (counts 3 and 4), and one count of attempting to elude a pursuing police vehicle (count 5).

*October 20 Continuance*

On October 20, 2022, the trial court continued Miller's trial date until February 2023.[1] The court order stated that the motion for continuance was brought "upon agreement of the parties pursuant to CrR 3.3(f)(1)" and that the reasons for the continuance were "[c]ase is new, defendant is charged with Murder 1, discovery is ongoing." Clerk's Papers (CP) at 176. Miller's counsel signed the order and marked "counsel to notify" on Miller's signature line. CP at 176.

At the next hearing, Miller objected to the continuance from October 20 and argued that the trial court violated his right to a speedy trial. The trial court found no violation of Miller's speedy trial right and clarified that its order for continuance was based on its finding that "substantial and compelling reasons" existed to continue the case:

> When the court order was signed on the 2[0]th of October, which I can see now that I signed, I found substantial and compelling reasons to grant that continuance, and the reasons that I granted it were because nobody, nobody could expect this case to go to trial in one week [from October 20] . . . I found substantial and compelling reasons to continue that case.

Rep. of Proc. (RP) (Oct. 31, 2022) at 16 (pretrial).

*Miller Requested Reappointment of Counsel and Attempted to Leave Courtroom*

In December, Miller made an unequivocal request to represent himself. The trial court engaged Miller in colloquy that included Miller's education and familiarity with evidentiary and criminal procedure rules, the severity of the charges and potential sentences, the court's inability

---

[1] If a report of proceeding exists for this hearing, it was not made a part of this appeal record.

to advise Miller, format of testimony if Miller testified, whether threats or promises were made to induce Miller to waive his right to counsel, it was unwise and not in his best interest to represent himself, whether Miller was requesting different or standby counsel, and knowing the consequences of the decision, was Miller voluntarily wanting to proceed without counsel. The trial court found that Miller knowingly and voluntarily waived the right to counsel and that he declined standby counsel. The trial court accordingly granted Miller's request to represent himself.

On January 26, 2023, Miller first raised the reappointment of counsel and the following exchange occurred:

> [TRIAL COURT]: You either want an attorney, [] Miller, right now or you do not, and that is the bottom line.
>
> [MILLER]: May I add my say? That's all I'm asking. I'm making my decision what I would like, period, bottom line. I have no problem with accepting representation because of the magnitude; however, Rules of Professional Conduct does warrant me to have an objective in my case. And I'm not saying that I'm taking it over or trying to mutiny or none of that. I would like some say. I would like to be present at every hearing. I want to be involved with my case, which is a right. So I'm not asking for the attorney to do anything that the Rules of Professional Conduct doesn't require them to do already.
>
> [STATE]: I would just ask that there be a question to [] Miller as to whether he wants an attorney to represent him and that that be either yes or no.
>
> [TRIAL COURT]: Yes or no, [] Miller.
>
> [MILLER]: They don't get to show up on my behalf without me, so, yes, I will take representation.
>
> [TRIAL COURT]: [] Miller, you're incarcerated right now in the Pierce County Jail. The jail only brings defendants to certain proceedings by their own protocol. There are certain things that happen in the courtroom that they do not transport for.

[MILLER]:  May I ask a question to the Court?  Is it unreasonable for me to be present at everything or is that a conflict within the statutes?  Because from what I understand, I can be present at everything.

[TRIAL COURT]:  All right, [] Miller, I have a full courtroom.  I have a full docket.  Do you want an attorney, sir?

[MILLER]:  Yes, I would like an attorney.

[TRIAL COURT]:  I'm appointing an attorney, and that attorney will be in charge of your case.  I'm appointing conflict counsel.

[MILLER]:  Then I object to that.  I'll go pro se, I guess, because you're telling me that they're going to control my being, my person.  I have rights.  I'm asking for my right.  The Court should protect my rights.  This is why I'm in the position I'm in now, Your Honor.

[TRIAL COURT]: No, [] Miller.  Sadly, this is not why you're in the position you're in.

[MILLER]:  I ask the Court to allow me to preserve my rights, constitutional rights to be present.  That's all I'm asking.

[STATE]:  So, Your Honor, it looks like [] Miller has made a decision to represent himself.

[TRIAL COURT]:  He has.

RP (Jan. 26, 2023) at 14-16 (pretrial).  At Miller's request, the trial court continued Miller's case to May 1 after finding good cause.  On April 28, however, the trial court, with no objection by either Miller or the State, "call[ed Miller's] matter for trial," granted a State's motion in limine, addressed other matters, and then recessed the trial until May 8.[2]

On May 8, the State moved for Miller to be restrained during the trial with a Band-It device because, in part, Miller had attempted twice to escape from jail within the two prior

---

[2] The trial court was in the middle of another unrelated trial that it anticipated would not finish until the end of the following week.

6

weeks. The first escape attempt occurred after Miller fooled a jail control operator to open a gate, which allowed Miller to leave his secured unit and get onto an elevator. After being moved to a more secure unit, Miller's second attempted escape occurred. Miller requested to go to the clinic for alleged medical issues, charged one of the corrections officers, and rammed his shoulder into the corrections officer to get past the officer.

Miller also had made a recent suicide attempt. The State also raised the following reasons for the restraint: the serious nature of the current charges; one of the charges involved an allegation that Miller fled from law enforcement for an extended period of time; jail records showed Miller, age 43, stood 6 feet 7 inches, and weighed 250 pounds; Miller appeared to have no physical maladies; Miller's prior record including a second degree murder conviction with a firearm; and the courtroom's three possible exits and lack of partitions.

The Band-It device is "a device that is strapped on the calf of the leg underneath [the defendant's] clothing so it's not visible. It is designed basically like an attached [stun gun], delivers 50,000 volts if we were [to] activate it, has a remote control." 3 RP (May 8, 2023) at 66. Miller did not object to the restraint. The trial court found the Band-It restraint "appropriate for use in this case for all the reasons indicated by the State." 3 RP (May 8, 2023) at 70-71.

Almost immediately after the corrections officers put the Band-It device on Miller and removed his visible restraints, Miller tried to exit the courtroom three times as the court discussed jury selection, each resulting in the Band-It device being deployed. The three deployments occurred over about 15 minutes. The "third deployment of the Band-It stun belt occurred almost immediately after [Miller] promised to comport his behavior with courtroom requirements." 4 RP (May 9, 2023) at 87. The trial court recessed until the next day.

On May 9, the trial court authorized the use of a full restraint chair for trial because of Miller's behavior the day before, the court's observation that after each deployment of the Band-It device it took Miller longer to become incapacitated, and its observation that Miller seemed to reach in the direction of a corrections officer's utility belt during one of the Band-It device's deployments. The court also noted that the Band-It device "is simply not sufficient. We need something additional to ensure the safety of everyone in the courtroom, the participants, court staff, corrections officers, people in the gallery, the deputy prosecutors, and I frankly don't see any lesser means than a restraint chair as being effective at this point." 4 RP (May 9, 2023) at 88. The court had moved to another courtroom but it still had multiple unlocked doors and one exit was closer to counsel table than in the courtroom from the prior day.

The court took testimony from a corrections officer about deployment of the Band-It device that morning. Anticipating that the court would order use of a modified restraint chair so Miller's upper body appeared free but that would prevent him from leaving the chair, corrections put Miller into the modified restraint chair. After about two minutes, Miller "start[ed] to manipulat[e], trying to get to the straps, undo the restraint chair and start pushing away from the table." 4 RP (May 9, 2023) at 90. The corrections officer told the court Miller had stated that he would not comply with court proceedings. Corrections sought use of the restraint chair including restraint of Miller's hands because they had "no more tools," and the trial court authorized use of the full restraint chair based upon the circumstances. 4 RP (May 9, 2023) at 90.

The trial court advised Miller that he would be waiving his "right to represent yourself . . . right to be present for trial . . . to be present for jury selection, to hear and question the witnesses who testify against you, to call witnesses in your own defense . . . [and] to testify at

8

your own trial or decide not to testify" if Miller made any more outbursts or any escape attempts. 4 RP (May 9, 2023) at 91. Miller responded, "I'm waiving those rights right now. I will take an appointment." 4 RP (May 9, 2023) at 92. When the trial court asked Miller whether he was asking to be represented at this point, Miller responded "I will take an appointment because I'm going to have an outburst, so we will just get to it." 4 RP (May 9, 2023) at 92. Miller further clarified, "I'm refusing to comply." 4 RP (May 9, 2023) at 93.

The trial court interpreted Miller as requesting appointment of counsel and ruled accordingly:

> [TRIAL COURT]: This matter has been pending -- when were charges first filed in this matter, [State]?
>
> [STATE]: September 2022, Your Honor.
>
> [TRIAL COURT]: September 2022. And so here we are a number of months later. [] Miller has, I'm sure, after a thorough colloquy, made a knowing, voluntary and intelligent waiver of his right to proceed represented by counsel.
>
> He can receive a fair trial representing himself. That determination has already been made. And I think that the interests of a fair and efficient trial are best served if we proceed to trial at this time, and that's what we are going to do.
>
> And so the Court is going to decline his motion to have counsel appointed for him at this point.

4 RP (May 9, 2023) at 106-07.

Miller chose to appear by video while the trial court conducted jury selection and motions in limine. Miller was visible from the shoulders up and with no visible signs of restraints, despite Miller being in the restraint chair with arms restrained, but shoulder restraints removed. The trial court again ruled that "for all the reasons that we have discussed repeatedly over the last

two days, if you are in the courtroom at all, you'll be in full restraints." 5 RP (May 10, 2023) at 191.

On May 11, the corrections officer testified that Miller repeatedly stated that "he is not going back to prison," which the officer thought could mean further escape or suicide attempts. 6 RP (May 11, 2023) at 365. For the next five days of trial, Miller appeared in the courtroom in full restraints.

*Sentencing*

A jury found Miller guilty of all five counts and also issued special verdicts that Miller used a firearm to commit both counts of second degree murder.

At sentencing, Miller appeared in the courtroom in the restraint chair. The trial court proceeded with sentencing without conducting a further individualized assessment of Miller's need for restraint. The trial court noted, "The [] Miller who sits in this courtroom today, the [] Miller who is behaving the way you were in the courtroom after restraints were imposed, I think any of us would be pleased to have you as a neighbor. And yet, there is this other [] Miller that kills people, that has guns unlawfully, that inflicts damage not just on one person, but it's a ripple effect on the entire community." 12 RP (Jun. 9, 2023) at 970.

Upon finding that the two second degree murder charges should merge, the trial court vacated count 2 for second degree murder. Miller's judgment and sentence listed count 2 as a current offense that Miller was found guilty by a jury verdict and noted that "a special verdict/finding for use of firearm was returned on Count(s) 1 & 2." CP at 151. The trial court included count 2 in the judgment and sentence's sentencing data and noted "vacated" for the

offender score part of count 2. CP at 152. The trial court also marked that the court "vacates, pursuant to the attached order Counts 2 in the charging document." CP at 153.

The trial court also found that Miller had an offender score of 9+ for count 1 based on Miller's criminal history, which included a prior adult conviction for second degree murder in 2000 and seven juvenile adjudications, which included two convictions for escape, one conviction for attempt to elude, and a point for committing the current crimes while on community custody. Furthermore, it found Miller indigent as defined in RCW 10.101.010(3)(a)-(d).

The trial court imposed a high-end standard range sentence of 517 months of total confinement and 36 months of community custody with various conditions. The trial court also imposed a $500 crime VPA.

Miller appeals.

## ANALYSIS

Miller argues that the trial court (1) violated his Sixth Amendment right by twice refusing to reappoint him counsel, (2) violated Miller's state constitutional rights by requiring him to appear restrained at sentencing, (3) erred in failing to apply a change to the law when calculating Miller's offender score, (4) failed to strike references to the second degree felony murder conviction from Miller's judgment and sentence, and (5) unlawfully imposed the $500 VPA. Additionally, in a statement of additional grounds (SAG), Miller raises multiple claims.

### I. REAPPOINTMENT OF COUNSEL

Miller argues that the trial court violated his state and federal constitutional rights by refusing to reappoint him counsel. Miller contends that he twice asked the trial court to

reappoint him counsel. Miller asserts that his requests were repeated and unequivocal and that, because the requests occurred before trial, the trial court should have granted it as a matter of law. The State contends that the trial court properly denied Miller's first request because such request was not unequivocal. The State then argues that the trial court's decision to deny Miller's later request was proper because Miller's request occurred on the "eve of trial and [would have caused] a delay if granted." Br. of Resp't at 18. We agree with the State.

Both the state and federal constitutions guarantee a criminal defendant the right to counsel and also the right to self-representation. U.S. CONST. amends. VI and XIV; WASH. CONST. art. 1, § 22; *Faretta v. California*, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *State v. Modica*, 136 Wn. App. 434, 440-41, 149 P.3d 446 (2006). However, the right to representation by counsel of choice is "limited in the interest of both fairness and efficient judicial administration." *State v. DeWeese*, 117 Wn.2d 369, 375, 816 P.2d 1 (1991). Once a defendant makes an unequivocal waiver of counsel, "'the defendant may not later demand the assistance of counsel as a matter of right'" and reappointment is "'wholly within the discretion of the trial court.'" *State v. Canedo-Astorga*, 79 Wn. App. 518, 525, 903 P.2d 500 (1995) (quoting *DeWeese*, 117 Wn.2d at 376-77).

In *Canedo-Astorga*, this court stated:

> In exercising discretion, a trial court should consider all the facts and circumstances of the case. Because "[s]elf-representation is a grave undertaking, one not to be encouraged," the request for reappointment should be granted absent reasons to deny. In some cases, however, there will be reasons to deny—for example, that the request comes on the eve of or during trial, and will delay or interrupt the trial if granted.
>
> . . . .

> Because a valid waiver of counsel must be knowing, voluntary and intelligent, the defendant who makes a valid waiver of counsel assumes the risk of ineptitude in those same ways, i.e., knowingly, voluntarily and intelligently. In view of this purposeful assumption of risk, the fact the risk later comes to pass, often just as predicted, does not by itself require reappointment. Nor does it divest the trial court of the discretion to consider all the circumstances that exist when the request for reappointment is made.

79 Wn. App. at 525-26 (internal footnotes omitted).

Here, Miller fails to show that the trial court abused its discretion in declining to reappoint him counsel. After the trial court granted Miller's request to proceed self-represented,[3] Miller first requested counsel be reappointed over a month and a half later. However, throughout a substantial colloquy with the trial court, Miller could not unequivocally say that he wanted appointment of counsel. Then following exchange occurred:

> [MILLER]: Yes, I would like an attorney.
>
> [TRIAL COURT]: I'm appointing an attorney, and that attorney will be in charge of your case. I'm appointing conflict counsel.
>
> [MILLER]: Then I object to that. I'll go pro se, I guess, because you're telling me that they're going to control my being, my person. I have rights. I'm asking for my right. The Court should protect my rights . . .

RP (Jan. 26, 2023) at 16. The trial court accordingly interpreted Miller's request as ultimately a decision to continue proceeding as self-represented instead of with counsel. Given Miller's equivocalness, a reasonable person in the trial court's position would have similarly concluded that Miller decided to not pursue appointment of counsel despite the trial court's offer to appoint counsel.

---

[3] On appeal, Miller does not challenge his December waiver of assistance of counsel and the trial court's granting of Miller's request to represent himself. Thus, we treat the trial court's finding that Miller unequivocally, knowingly, and voluntarily waived his right to counsel as a verity on appeal.

Miller's second request came the morning of voir dire after he made three attempts to leave the courtroom. Miller requested appointment of counsel after he notified the court he would not comply with the trial court's request for no outbursts during trial. After considering Miller's request, the trial court concluded that "[Miller] can receive a fair trial representing himself. That determination has already been made. And I think that the interests of a fair and efficient trial are best served if we proceed to trial at this time, and that's what we are going to do. And so the Court is going to decline his motion to have counsel appointed for him at this point." 4 RP (May 9, 2023) at 106-07. Given Miller's previous opportunity to unequivocally request reappointment of counsel, the late timing of this request, and Miller's contention that he wanted counsel because he was refusing to comply with the trial court's request for behavioral modification, the trial court was within its discretion to deny Miller's request. Miller fails to otherwise show that the trial court's decision amounted to an abuse of discretion.

Miller fails to show that the trial court abused its discretion in denying any request for reappointed counsel. Accordingly, we hold that Miller's claim fails.

## II. RESTRAINT AT SENTENCING

Miller argues that a new sentencing hearing is required because the trial court violated his rights under article 1, section 22 of the Washington Constitution by forcing him to wear physical restraints at sentencing without completing an individual assessment that such restraints were necessary. We disagree.

A. *Legal Principles*

It is well-established under both federal and state due process law that a defendant has a "right to appear in court free from unjustified restraints." *State v. Luthi*, 3 Wn.3d 249, 256, 549

P.3d 712 (2024). And this right extends to sentencing proceedings. *State v. Jarvis*, 27 Wn. App. 2d 87, 98, 101, 530 P.3d 1058, review denied, 2 Wn.3d 1003 (2023).

But the right to be free from restraint is not absolute. *State v. Jackson*, 195 Wn.2d 841, 852, 467 P.3d 97 (2020). Trial courts have discretion to determine matters implicating courtroom security, including whether to restrain a defendant. *Id.* at 852. "'A trial judge must exercise discretion in determining the extent to which courtroom security measures are necessary to maintain order and prevent injury. That discretion must be founded upon a factual basis set forth in the record. A broad general policy of imposing physical restraints upon prison inmates charged with new offenses because they may be potentially dangerous is a failure to exercise discretion.'" *State v. Clark,* 143 Wn.2d 731, 773, 24 P.3d 1006 (2001) (internal quotations omitted) (quoting *State v. Finch*, 137 Wn.2d 792, 846, 975 P.2d 967 (1999)).

Almost as long as our state's statehood, we have recognized that to physically restrain a defendant at trial there must be "'some impelling necessity demand[ing] the restraint.'" *Luthi*, 3 Wn.3d at 256 (quoting *State v. Williams*, 18 Wash. 47, 51, 50 Pac. 580 (1897)). In determining necessity for restraint, courts consider the following relevant factors:

> [T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

*Jackson*, 195 Wn.2d at 853 (quoting *State v. Hutchinson*, 135 Wn.2d 863, 887-88, 959 P.2d 1061 (1998)).

"Therefore, '[a] trial court must engage in an individualized inquiry into the use of restraints prior to every court appearance' to determine whether the restraints are necessary for courtroom security." *Luthi*, 3 Wn.3d at 256 (quoting *Jackson*, 195 Wn.2d at 854) (alteration in original). A trial court's decision to restrain a defendant is reviewed for an abuse of discretion. *State v. Turner*, 143 Wn.2d 715, 724, 23 P.3d 499 (2001). A trial court's failure to exercise its discretion in conducting an individualized inquiry constitutes constitutional error and is, thus, presumptively prejudicial. *Jackson*, 195 Wn.2d at 854; *Clark*, 143 Wn.2d at 774.

Claims of unconstitutional shackling are subject to harmless error analysis. *Jackson*, 195 Wn.2d at 855. The State bears the burden to prove beyond a reasonable doubt that the constitutional violation was harmless. *Id.* at 856. "'[T]he test for harmless error is whether the state has overcome the presumption of prejudice when a constitutional right of the defendant is violated when, from an examination of the record, it appears the error was harmless beyond a reasonable doubt, or whether the evidence against the defendant is so overwhelming that no rational conclusion other than guilt can be reached.'" *Id.* at 855 (quoting *Clark*, 143 Wn.2d at 775-76).

Under RAP 2.5(a), we may refuse to review unpreserved errors, even those reaching constitutional issues. This rule exists to "'encourage the efficient use of judicial resources. The appellate courts will not sanction a party's failure to point out at trial an error which the trial court, if given the opportunity, might have been able to correct to avoid an appeal and a consequent new trial.'" *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009) (quoting *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)).

Under an exception to this general rule, a party may raise an unpreserved error by showing it constitutes a "manifest error affecting a constitutional right." RAP 2.5(a)(3). To be manifest, the appellant must show that the alleged constitutional error caused actual prejudice— they must make a plausible showing that the error caused practical and identifiable consequences at trial. *State v. Dimas*, 30 Wn. App. 2d 213, 221, 544 P.3d 597, *review denied* 3 Wn.3d 1026 (2024). In analyzing actual prejudice, we focus on assessing whether the error was "so obvious on the record that [it] warrants appellate review" and place ourselves "in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error." *O'Hara*, 167 Wn.2d at 99-100.

B.      *The State Proves Harmlessness Beyond a Reasonable Doubt*

At sentencing, Miller appeared in a restraint chair. However, there is no evidence on the record that Miller made any attempt to preserve this issue for appeal. Miller made no objections nor even complained at the hearing regarding the restraints. No party addressed RAP 2.5. Although we believe that Miller cannot demonstrate manifest constitutional error, assuming without deciding that Miller satisfied RAP 2.5, we conclude that, on the shackling claim, the State proves harmlessness beyond a reasonable doubt.

In *Finch*, the defendant was shackled at his legs throughout the jury trial and a special sentencing proceeding, and, during two witnesses' testimony, Finch was further restrained by having his right hand handcuffed to his chair and his leg shackles handcuffed to the table leg. *Finch*, 137 Wn.2d at 850-51. Prior to trial, Finch had repeated his desire to kill one of the witnesses, Finch was "a rather large man . . . and once he got going, he'd have quite a lot of momentum," the courtroom was small, and the one witness had to pass in close proximity to

17

Finch. *Id.* at 851. Our Supreme Court found that, while the trial court had some concern about the one witness, it did not justify the decision to shackle Finch when the one witness was not testifying. *Id*. The Court reasoned, "There [was] no indication from the record or the hearing on this matter that the Defendant posed a threat to anyone else in the courtroom, that the Defendant posed an escape risk, or that he had been disruptive during courtroom proceedings." *Id*. The Court found shackling constituted an abuse of discretion—"clear error." *Id.* at 862.

In *Clark*, the defendant was shackled when entering in front of the entire jury venire for the first day of voir dire, when the verdict was read, and throughout the special sentencing proceeding. *Clark*, 143 Wn.2d at 772, 774. The State conceded the trial court did not perform an individualized assessment of the need for shackling. *Id.* at 774. And the State "direct[ed the Supreme Court] to no evidence in the record, nor did [the Court] find any, that would imply Clark posed a threat of violence, escape, or disruption. Nor was there evidence other than decorous behavior during pretrial hearings." *Id*.

The Supreme Court found shackling Clark was constitutional error because there was no individualized assessment, but ultimately concluded that Clark was not prejudiced and held the error harmless beyond a reasonable doubt. *Id.* at 777. The Court reasoned that observing (1) Clark's shackling on the first day of voir dire was logically offset by observing Clark unshackled at over two weeks of trial, (2) his shackling on the day of reading the verdict was harmless because the jury had already adjudged Clark guilty before seeing him shackled for the second time, and (3) his shackling during the penalty phase was harmless because Clark never entered or left during the proceedings, a protective skirt concealed the shackles at counsel table,

the shackles were taped to eliminate any noise, and Clark never moved from his seat except to stand for the entry of the judge and jury. *Id.* at 776-77.

Here, while the trial court conducted an individualized assessment during trial, it did not conduct a separate individualized assessment at sentencing. In support of its argument that the trial court did not err by not making an additional finding of shackling necessity at sentencing, the State points us to evidence in the record of Miller's behavior in custody, the corrections officer's testimony, and the court's own observations of Miller's conduct in court. This includes Miller's two escape attempts from jail in the two weeks prior to trial, which included shoulder-checking a guard; Miller's suicide attempt shortly before trial; Miller's multiple attempts to leave the courtroom; three deployments of the Band-It device and Miller's increased tolerance of the Band-It device; and Miller's own comments that he refused to comply with the court's behavioral requirements and that he would have further incidents. Notably, the record also reflects Miller's attempt to tamper with the straps on the restraint chair, which was grounds for the fourth deployment of the Band-It device.

Miller suggests that there was reason to believe no restraints were necessary because Miller had no behavior issues as trial progressed and the trial court stated, "The Paris Miller who sits in this courtroom today, the Parris Miller who is behaving the way you were in the courtroom after restraints were imposed. I think any of us would be pleased to have you as a neighbor." 4 RP (Jun. 9, 2023) at 970 (emphasis added). But this ignores that the court stated, "after restraints were imposed." The trial court recognized Miller's compliant behavior post-restraints but said nothing to indicate that the court believed Miller's compliance would continue without the restraints. Contrary to Miller's argument, we are unpersuaded that this indicates that

the trial court would have imposed no restraints during sentencing, not considering the trial court's other decisions to restrain Miller and Miller's conduct even while being restrained.

The State contends the trial court did not need to conduct another inquiry given the court's ruling twice that Miller would be in restraints whenever he was in the courtroom and that its ruling would not change. And, even if the court failed to conduct another specific inquiry, the State argues that it was harmless beyond a reasonable doubt because (1) any further inquiry would have resulted in a decision to keep Miller restrained and (2) there is no doubt that the trial court would have imposed the same standard range sentence whether Miller was restrained or not.

Here, even if we assumed without deciding that the court erred in not conducting an individualized inquiry into the need for restraints at sentencing, the State has shown beyond a reasonable doubt that any constitutional violation to not inquire into whether restraints were necessary at sentencing was harmless. The State has overcome the presumption of prejudice based upon the evidence it points to in the record of Miller's violence toward himself and others—including corrections deputies—multiple escape attempts shortly prior to and during the trial despite the use of the Band-It device, Miller's temperament and statements about his future noncompliant conduct, his age and physical attributes, and disruptions to the courtroom proceedings. Miller's current murder charge and prior murder conviction, along with the courtrooms' descriptions and security concerns were also raised below.

Clearly, the State has shown that Miller posed a threat of violence, escape, and disruption. Additionally, the State has shown that nearly every factor relevant to determining whether restraints were necessary was present in Miller's case leading up to sentencing. *See*

20

*Jackson*, 195 Wn.2d at 853 ("[t]he seriousness of the present charge. . .; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes[;] threats to harm others or cause a disturbance; self-destructive tendencies; . . . the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.").

Moreover, even if Miller appeared with no restraints at sentencing, there is no rational conclusion where the trial court would have imposed anything less than the high end of the standard range. Miller had a prior adult conviction for murder and two prior juvenile convictions for escape and one for attempt to elude. Miller's current offenses involved murder with a firearm enhancement and attempt to elude with Miller eluding pursuing police vehicles at over 100 miles per hour. In his attempt to elude law enforcement, Miller jumped out of his car and ran away requiring a foot chase.

The State has proven that any constitutional error related to the trial court's failure to conduct an additional individualized inquiry into whether restraints were necessary at Miller's sentencing was harmless beyond a reasonable doubt. Accordingly, we hold that reversal for a new sentencing hearing is not warranted.

### III. INCLUSION OF PRIOR JUVENILE ADJUDICATIONS IN OFFENDER SCORE

Miller asserts that he is entitled to resentencing based on an offender score of seven because he argues that the legislature's most recent amendment to RCW 9.94A.525(1) applies to pending cases. We disagree.

A.      *Legal Principles*

We review a trial court's calculation of an offender score and questions of statutory interpretation de novo.  *State v. Rodriguez*, 183 Wn. App. 947, 953, 335 P.3d 448 (2014).

We employ statutory interpretation to determine and give effect to the intent of the legislature.  *Id*.  In doing so, "we first look to the plain language of the statute considering the text of the provision in question, the context of the statute, and the statutory scheme as a whole."  *Id*.  "[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent."  *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002).  Only if the plain language review makes the statute susceptible to more than one interpretation do we turn other statutory interpretation tools like legislative history and relevant case law.  *Rodriguez*, 183 Wn. App. at 953.

B.      *RCW 9.94A.525(1)(b) Does not Apply Retroactively*

Effective July 23, 2023, the legislature amended RCW 9.94A.525(1) by adding subsection (b), which provides that "adjudications of guilt pursuant to Title 13 RCW which are not murder in the first or second degree or class A felony sex offenses may not be included in the offender score."  LAWS OF 2023, ch. 415, § 2.  Prior to the amendment and in September 2022 when Miller committed the acts underlying his crimes here, former RCW 9.94A.525(1) required a trial court to include appropriate juvenile adjudications in its calculation of a defendant's offender score.  RCW 9.94A.525(g) (2021).

Another provision of chapter 9.94A RCW provides, "Except as otherwise provided in this chapter, any sentence imposed under this chapter shall be determined in accordance with the law in effect *when the current offense was committed*."  RCW 9.94A.345 (emphasis added).

Additionally, a statute known as the savings clause, provides that "[w]henever any criminal or penal statute shall be amended or repealed, all offenses committed or penalties or forfeitures incurred while it was in force shall be punished or enforced as if it were in force, notwithstanding such amendment or repeal, *unless a contrary intention is expressly declared in the amendatory or repealing act*." RCW 10.01.040 (emphasis added). And the savings clause applies to "'substantive changes in the law,'" including punishment changes. *State v. Solomon Gibson*, 33 Wn. App. 2d 618, 621, 563 P.3d 1079 (2025) (quoting *State v. Jenks*, 197 Wn.2d 708, 721-22, 487 P.3d 482 (2021)).

"The legislature can avoid application of RCW 9.94A.345 and RCW 10.01.040 by expressing a clear intent that a statutory amendment applies retroactively." *Id*. Our court has already considered whether RCW 9.94A.525(1) includes such statement of intent from the legislature and concluded it does not. *See id.* at 622, n.1.

In *Solomon Gibson*, trial court sentenced Solomon Gibson in November 2023 for crimes that occurred in March 2023. *Id.* at 620. It determined that RCW 9.94A.525(1)(b), amended effective July 2023, applied such that Solomon Gibson's prior juvenile adjudications did not count in his offender score. *Id.* at 619-20.

We held that the sentencing court erred by not considering Solomon Gibson's juvenile adjudications in his offender score. *Id.* at 624. In doing so, we explained that:

> The intent statement provides that the legislature intends to facilitate rehabilitation, reintegration, and due process, and to recognize the research of juvenile brains and the disproportionate impact of juvenile adjudications on adult sentences. LAWS OF 2023, ch. 415, § 1. Because the amendment affects offender scores, it is a substantive change in the law to which the savings clause applies. Nothing in the bill mentions retroactive application or indicates that it should apply to cases pending on the effective date. Applying the 2023 amendment to Solomon Gibson's

> case would therefore violate RCW 9.94A.345 by applying a sentencing law that was not in effect when he committed his offenses in March, 2023.

*Id.* at 622-23 (citation and footnote omitted); *see also State v. Troutman*, 30 Wn. App. 2d 592, 594, 599-600, 546 P.3d 458, *review denied*, 3 Wn.3d 1016 (2024) (holding that, per the plain language of the amendment, RCW 9.94A.525(1)(b) could not apply to an offense that occurred in 2019).

Here, like in *Solomon Gibson*, even though sentencing occurred after the 2023 amendment's effectiveness date, the acts underlying Miller's convictions occurred before RCW 9.94A.525(1)(b) came into effect. Therefore, just as it would in Solomon Gibson's case, applying the 2023 amendment here would violate RCW 9.94A.345 when RCW 9.94A.525(1)(b) was not in effect at the time when Miller committed the offenses. *See Solomon Gibson¸* 33 Wn. App. 2d at 622-23.

Nevertheless, Miller asserts that the amendment should apply to pending cases because the amendment was remedial in nature. Miller argues that the amendment is remedial because it is a change to sentencing procedures versus a change affecting a defendant's substantive or vested right.

"Remedial statutes generally involve procedural matters rather than substantive matters." *State v. Tester*, 30 Wn. App. 2d 650, 658, 546 P.3d 94, *review denied*, 3 Wn.3d 1019 (2024). However, as we stated in *Tester*, changes made to criminal punishments are not procedural and are instead substantive. *Id.* at 659. Additionally, we held that "'the remedial nature of an amendment is irrelevant when the statute is subject to [the savings clause].'" *Id.* at 658-59 (citing *State v. Kane*, 101 Wn. App. 607, 613, 5 P.3d 741 (2000)).

Before the addition of RCW 9.94A.525(1)(b), trial courts were required to include appropriate juvenile adjudications in calculating a defendant's offender score. RCW 9.94A.525 (2022). The defendant's offender score then contributed to the defendant's sentencing range for which the trial court could only deviate from in certain circumstances and upon a record of its reasons for the deviation. RCW 9.94A.530, .535. Due to this statutory structure, the amendment to RCW 9.94A.525(1)(b) changed the criminal punishment a defendant could be sentenced to, absent a statutorily allowed deviation from the standard range. Moreover, as we stated in *Solomon Gibson*, RCW 9.94A.525(1)(b) is subject to the savings clause because it is a substantive change in the law. 33 Wn. App. 2d at 622. And, because RCW 9.94A.525(1)(b) is subject to the savings clause, any remedial nature of the recent amendment is irrelevant to our consideration here. *Tester*, 30 Wn. App. 2d at 658-59.

Finally, Miller also argues that, because of the legislature's intent statement in the amendment, the legislature intended for the change to apply to pending cases like his. Miller relies on the amendment's intent statement to argue that the "statement of intent uses strong words that convey the legislature's intent to eliminate sentencing standards that automatically increase a person's punishment based on their actions as a child." Br. of Appellant at 33-34.

While "[w]e must construe statutes consistent with their underlying purposes," nothing in the statement of intent discusses a temporal interest/intent to the extent that it is clear that the legislature intended what Miller contends. *State v. Eaton*, 168 Wn.2d 476, 480, 229 P.3d 704 (2010); LAWS OF 2023, ch. 415, § 1.

In accordance with our decision in *Solomon Gibson*, we hold that the trial court did not err in including Miller's juvenile adjudications in his offender score.

IV. JUDGMENT AND SENTENCE REFERENCES TO VACATED CONVICTION

Miller argues that this court should remand for the trial court to strike all references to the second degree felony murder conviction from Miller's judgment and sentence because that conviction was vacated. The State agrees. We agree with both parties.

The jury found Miller guilty of both second degree murder and second degree felony murder. The trial court found that the same acts formed the basis for the two crimes. Thus, the trial court found that the second degree felony murder conviction merged into the second degree murder conviction and vacated the second degree felony murder conviction.

"To assure that double jeopardy proscriptions are carefully observed, a judgment and sentence must not include any reference to the vacated conviction." *State v. Turner*, 169 Wn.2d 448, 464, 238 P.3d 461 (2010). In *State v. Caril*, Division I of this court remanded back to the trial court because the appellant's judgment and sentence included references to a vacated conviction and its associated sentencing enhancement.[4] 23 Wn. App. 2d 416, 435, 515 P.3d 1036 (2022), *review denied*, 200 Wn.2d 1025 (2023).

Here, while the trial court vacated Miller's second degree felony murder conviction, the judgment and sentence still listed in places the second degree felony murder conviction, including under Miller's "Current Offenses." CP at 150-51. Accordingly, we remand for the

---

[4] Division I held that "resentencing consistent with *Turner* is appropriate" for this error. *State v. Caril*, 23 Wn. App. 2d at 435. In *Turner*, the Supreme Court considered two cases where the trial courts had vacated convictions but also indicated in either the judgment and sentence or on the record that the vacation was conditional to a certain degree. 169 Wn.2d at 452. The Supreme Court remanded to the trial courts with directions to remove a conditional vacation order appended to one of the appellant's judgment and sentence and "redact all references to any validity or import attributable to the vacated lesser conviction in [the other appellant's] case." *Id.*

26

trial court to strike all references to the second degree felony murder conviction from Miller's judgment and sentence.

## V. VPA

Miller argues that we should strike $500 VPA from his judgment and sentence. The State agrees. We agree with both parties.

At sentencing, the trial court found Miller indigent as defined in RCW 10.101.010(3)(a)-(c). However, as a part of Miller's judgment and sentence, the trial court ordered Miller to pay a $500 crime VPA.

Due to a recent amendment to the statute governing the VPA, this legal financial obligation can no longer be imposed on defendants found indigent as defined in RCW 10.01.160(3) at the time of sentencing. RCW 7.68.035(4); LAWS OF 2023, ch. 449, § 1; *State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023). And this change in the law applies to cases on direct appeal, such as Miller brings here. *See Ellis*, 27 Wn. App. 2d at 16.

Accordingly, we hold that the $500 VPA fee should be stricken from Miller's judgment and sentence.

## VI. STATEMENT OF ADDITIONAL GROUNDS

In a SAG, Miller makes five claims with the first four related seemingly to one continuance granted on October 20, 2022. *See* SAG at 1-2. Miller claims that the trial court (1) abused its discretion in denying Miller access to the October 20, 2022, hearing, (2) abused its discretion in allowing Miller's former counsel to sign a continuance on his behalf, (3) abused its discretion in applying Wash. Super. Ct. Crim. R. (CrR) 3.3(f)(1), (4) violated CrR 3.3's time

limit because the trial court had no authority to grant the continuance, and (5) violated his state and federal constitutional rights to a speedy trial. SAG at 1-2.

On October 20, 2022, when Miller's case was 31 days old, the trial court continued Miller's trial date to February 2023. The trial court's written order stated that the continuance motion was brought "upon agreement of the parties pursuant to CrR 3.3(f)(1)" and that the reasons for the continuance were "[c]ase is new, defendant is charged with Murder 1, discovery is ongoing." CP at 176. The order was signed by Miller's counsel and marked "counsel to notify" in place of Miller's signature. CP at 176.

When Miller raised many of the arguments before the trial court that he now raises here, Miller contended that he was supposed to be in court that day but, while his family showed up for the hearing, the jail did not transport Miller to court. The trial court clarified that its order for continuance was based on its finding that "substantial and compelling reasons" existed to continue the case "because nobody, nobody could expect this case to go to trial in one week [from the date of the hearing]." RP (Oct. 31, 2022) at 16.

First, Miller asserts that the trial court abused its discretion when it denied Miller "an essential element of Due Process (attendance to every hearing at every stage)." SAG at 2. "A criminal defendant has a constitutional right to be present in the courtroom at all critical stages of the trial." *State v. Thompson*, 190 Wn. App. 838, 843, 360 P.3d 988 (2015). However, this right is not absolute. *Id.* at 843. And our courts have held that a defendant does not have a right to be present at a hearing on a motion for a continuance. *State v. Irby*, 170 Wn.2d 874, 882, 246 P.3d 796 (2011) (citing to *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 920, 952 P.2d 116 (1998)). Thus, Miller's claim here fails.

Next, Miller contends that the trial court abused its discretion in allowing Miller's counsel at the time to sign a continuance on his behalf and applying CrR 3.3(f)(1) because "[u]nder the plain language of the court rule, an attorney may not sign a written agreement for the defendant." SAG at 1.

At the time of the continuance hearing, CrR 3.3(f)(1) provided that "[u]pon written agreement of the parties, which must be signed by the defendant, the court may continue the trial date to a specific date."[5] CrR 3.3(f)(1) (2022). However, subsection (f)(2) provided that "[o]n motion for the court or a party, the court may continue the trial date to a specific date when such continuance is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense." CrR 3.3(f)(2).

Here, the trial court's written order continuing Miller's trial marked a box stating that the parties agreed to continue the trial date; however, the trial court also included reasons for the continuance beyond any agreement between the parties. Additionally, when Miller objected to the continuance at the next hearing before the trial court, the court clarified that it made this continuance order pursuant to its finding under CrR 3.3(f)(2) that "substantial and compelling reasons" existed to continue the case, not because the parties agreed.[6] RP (Oct. 31, 2022) at 16.

---

[5] Effective January 1, 2023, this portion of the rule changed so that a defendant's signature was not required for a written agreement so long as their counsel signed and to provide that "[i]n the absence of the defendant's signature or presence at the hearing, defense counsel's signature constitutes a representation that the defendant has been consulted and agrees to the continuance. The court's notice to defense counsel of new hearing dates constitutes notice to the defendant."

[6] Because the trial court's oral decision is not inconsistent with the trial court's written findings and conclusions and, merely, clarifies which basis the trial court applied in ordering a continuance, we may consider the trial court's oral decision. *See State v. Kull*, 155 Wn.2d 80, 88, 118 P.3d 307 (2005).

Furthermore, even if the trial court applied CrR 3.3(f)(1), a Supreme Court order in effect at the time due to COVID waived a defendant's signature requirement. Order, No. 25700-B-658, *In re Statewide Response by Washington State Courts to the COVID-19 Public Health Emergency*, at 1 (Wash. Feb. 19, 2021).[7] Thus, the evidence in the record shows that the trial court did not apply CrR 3.3(f)(1) in granting the continuance. Even if it did, the trial court did not err in allowing Miller's counsel to sign on his behalf at the time. Miller's claim fails.

Miller also claims that the trial court abused its discretion in granting a continuance beyond CrR 3.3's 60-day time limit because the trial court had no lawful basis to continue his case and, thus, the 60-day time limit expired. SAG at 2. However, as we discussed above, the trial court did have authority to order the continuance pursuant to CrR 3.3(f)(2), and, therefore, the CrR 3.3's time-for-trial limit did not expire with the trial court's lawful continuance order. *See* CrR 3.3(b)(1)(ii), (b)(5), (e)(3).

Finally, Miller claims that the trial court violated his speedy trial rights, a claim which we review de novo. *State v. Ollivier*, 178 Wn.2d 813, 826, 312 P.3d 1 (2013). As a threshold to a speedy trail claim, Miller must show that the length of the delay crossed a line from "ordinary" to "'presumptively prejudicial.'" *See Ollivier*, 178 Wn.2d at 827 (quoting *Doggett v. United States*, 505 U.S. 647, 651-52, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992)). If the delay was presumptively prejudicial, we consider the nonexclusive "*Barker*" factors of "'[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.'"

---

[7] https://www.courts.wa.gov/content/publicUpload/Supreme% 20Court% 20Orders/25700-B-658.pdf.

*Ollivier*, 178 Wn.2d at 827 (quoting *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972)).

Assuming without deciding the delay in Miller's case qualified as presumptively prejudicial, we consider the *Barker* factors. Here, from arraignment to trial, Miller's case had less than an eight-month delay. Trial was delayed twice at the request of the defense. The State and defense counsel jointly requested the first continuance on October 20 because discovery and interviews were not complete. The trial court found good cause. Miller requested the second continuance in late January, which the trial court also granted. Both continuances in this case were sought to accommodate defense's need to prepare for trial given the significant allegations, and Miller objected only to the first continuance. Further, there is no indication that the delay here was due to bad faith by the government, and Miller makes no particularized showing that the delay resulted in either oppressive pretrial incarceration, anxiety and concern, or impairment of his defense. *See Ollivier*, 178 Wn.2d at 841 ("A defendant ordinarily must establish actual prejudice before a violation of the constitutional right to a speedy trial will be recognized."). Under these circumstances, Miller fails to show that the trial court violated his speedy trial rights.

Accordingly, we hold that all of Miller's SAG claims fail.

CONCLUSION

We affirm Miller's convictions, but remand for the trial court to strike any reference to a second degree felony murder conviction and the $500 VPA from Miller's judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Lee, J.

Cruser, C.J.